53 F.3d 507
 Medicare & Medicaid Guide P 43,201,
42 Fed. R. Evid. Serv. 201
UNITED STATES of America, Appellee,
v.
Jamshaid KHAN; Charles Addo Yobo; Audrey Cecile Sadaphal;
Nephtali Montfort and Parnell St. Louis, Defendants,
Mohammed Sohail Khan; Jacqueline Otero; Deborah Williams;
Rosaly Saba Khalil; Lancaster Lo and Gilbert
Ross, Defendants-Appellants.
 Nos. 293, 331, 458, 328, 305 and 291, Dockets 93-1797 to
 93-1799, 93-1801, 93-1802, and 93-1895.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 1, 1994.
Decided April 21, 1995.
 
 Karen B. Shaer, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D.N.Y., Christopher P. Reynolds, Benjamin E. Rosenberg, Paul G. Gardephe, Asst. U.S. Attys., of counsel) for appellee.
 Stephen M. Goldenberg, New York City, for defendant-appellant Mohammed Sohail Khan.
 Jane Simkin Smith, Millbrook, NY, for defendant-appellant Deborah Williams.
 Carolyn Corn Bichoupan, Carle Place, NY, for defendant-appellant Rosaly Saba Khalil.
 Sanford M. Katz, New York City, for defendant-appellant Lancaster Lo.
 Vivian Shevitz, Mt. Kisco, NY, for defendant-appellant Gilbert Ross.
 Before: FEINBERG, VAN GRAAFEILAND and MINER, Circuit Judges.
 MINER, Circuit Judge.
 
 
 1
 Defendants-appellants Deborah Williams, Rosaly Saba Khalil, Lancaster Lo and Gilbert Ross appeal from judgments of conviction and sentence entered on November 10, 1993, in the United States District Court for the Southern District of New York (Martin, J.) following a jury trial. Defendant-appellant Mohammed Sohail Khan appeals from a judgment of conviction and sentence entered on December 3, 1993, in the same court, after a plea of guilty.[1] All defendants-appellants were convicted of conspiring to participate in, and participating in, a racketeering enterprise designed to defraud the New York State Medicaid system, in violation of 18 U.S.C. Sec. 1962(c) and (d), and mail fraud, in violation of 18 U.S.C. Sec. 1341, and each defendant-appellant, with the exception of Ross, was convicted of money laundering, in violation of 18 U.S.C. Sec. 1956(a)(1)(A)(i).
 
 
 2
 Williams was sentenced to forty-one months in prison, restitution of $1,814,896 to the State of New York, and forfeiture of $50,000 to the United States. Khalil was sentenced to forty-one months in prison, restitution of $1,931,992, and forfeiture of $90,000. Lo was sentenced to thirty-seven months in prison, restitution of $1,319,000, and forfeiture of $95,000. Ross was sentenced to forty-six months in prison, restitution of $612,855, and forfeiture of $40,000. Khan was sentenced to sixty months in prison and restitution of $8,000,000. Each defendant-appellant also received a term of supervised release and a special assessment.
 
 BACKGROUND
 
 3
 At trial, the government set out to prove that, from February 1990 through June 1991, the defendants and others participated in a racketeering enterprise that defrauded the New York State Medicaid system ("Medicaid") of approximately $8,000,000. Khan was the leader of the enterprise, which operated through four clinics (the "Khan clinics") located at 1153 and 1826 Grand Concourse in the Bronx, and at 461 Lenox Avenue and 2301 Second Avenue in Manhattan, through the Ridgewood Pharmacy at 1153 Grand Concourse in the Bronx, and through two corporations controlled by Khan, Manhasset Diagnostics, Inc., and Manhasset Community Management Services, Inc.
 
 
 4
 The government presented its case through the testimony of cooperating co-conspirators, including Khan, two physicians who worked at the clinics, Charles Addo-Yobo and Audrey Cecile Sadaphal, two physicians' assistants named Melville Ferns and James Rich, and Carmen Guzman, who was employed as a secretary and, later, as an office manager at one of the clinics. The government also presented the expert testimony of physicians associated with the New York State Department of Social Services ("DSS"), testimony from DSS employees, two of whom posed as patients at the Khan clinics, and the testimony of two actual patients. In addition, the government introduced inculpatory as well as false exculpatory statements made by each of the defendant-physicians as well as thousands of patient files seized from the Khan clinics and bills sent to Medicaid.
 
 
 5
 The evidence illustrated the following scheme to defraud: Indigent patients, many of whom were homeless, alcoholic, or drug-addicted, came to the clinics to obtain prescriptions for drugs for which they had no medical need. The patients often would fill the prescriptions at a local pharmacy and then sell the drugs on the street. To obtain the prescriptions, the patients provided the clinics with valid Medicaid recipient numbers, underwent medically unnecessary procedures and tests, and gave blood samples. Physicians' assistants ("PAs"), who performed the vast majority of the patient diagnoses, saw approximately twenty-five to forty patients each weekday at the clinics. The PAs seemed fully aware of the fraud and made no pretense of legitimate treatment. Doctors rarely were on the premises of the clinics.
 
 
 6
 Medicaid was billed for each patient visit and office test. In addition, each blood sample was sent to Clin Path, a medical laboratory located in New Jersey, which, in turn, billed Medicaid for every blood test. Clin Path "kicked back" twenty-seven percent of its Medicaid receipts to Khan. Khan was the primary organizer of the scheme; he leased the space for the clinics, purchased what limited medical supplies were provided, and hired and paid the PAs. Khan advertised for the physicians by placing advertisements in the New York Times, promising "[v]ery, very good $ $." Because only a medical doctor could qualify as a Medicaid provider, Khan could not operate the scheme without the physicians.
 
 
 7
 The physicians received Medicaid payments for office visits and tests purportedly performed at the clinics. Of these payments, the physicians would "kick back" thirty to forty percent to Khan. The payments from the physicians eventually were disguised as rent payments. Under this arrangement, each physician entered into a lease agreement with Khan in which the physician agreed to pay Khan $1500 per week rent. This payment did not correspond to the actual rent paid by Khan for the premises.
 
 
 8
 The Khan clinics were unusual in a number of ways. They lacked substantial medical equipment and were very dirty and unsanitary. In some of the clinics, signs hung from the walls instructing patients not to discuss their prescriptions with one another. The patients consisted mainly of men between the ages of twenty-five and forty-five, in contrast to the diverse patient-mix that might be expected in the urban areas where the clinics were located. Such a mix would include children, women, and elderly persons. There never were any emergencies or hospital referrals, and every patient was a Medicaid recipient. Finally, the clinics had a policy of limiting follow-up visits. This policy was expressed at the 2301 Second Avenue clinic, for example, by a sign stating "no more old patients for tomorrow." While medically indefensible, the policy reduced the number of less-lucrative second visits that the clinics might expect. To accomplish the same purpose, repeat patients often were treated as "first-time" patients at several of the clinics.
 
 
 9
 The physician-appellants rarely examined any patients themselves;[2] the work was done by the PAs. The PAs would see each patient for only a few minutes. The clinics' records indicated that virtually all of the patient complaints were described in one of a very limited number of ways; nearly all of the blood samples taken were analyzed under one of four highly specialized (and expensive) tests; hearing tests were ordered for patients whose charts indicated no hearing problem; EKG tests lacked required interpretation, and some EKG graphs were cut into pieces and distributed among the files of various patients. Charles Addo-Yobo and Audrey Sadaphal, physicians who worked at the clinics, testified that they realized almost immediately that the clinics were not legitimate, and that they were fraudulently billing Medicaid.
 
 
 10
 Following a three and a half week trial, the jury found Williams, Khalil and Lo guilty of all charges and Ross guilty of all charges except money laundering. The district court imposed sentence upon the four physician-appellants as well as upon Khan, who pleaded guilty. On appeal, Williams, Khalil, Lo, and Ross challenge the sufficiency of the evidence presented at trial and make various claims of error in regard to evidentiary rulings and the jury charge. Further, each defendant challenges portions of his or her sentence and each defendant, with the exception of Khan, challenges the district court's assessment of restitution.
 
 DISCUSSION
 I. EVIDENTIARY SUFFICIENCY CLAIMS
 
 11
 The physician-appellants argue that the evidence was insufficient to establish their knowledge of the fraudulent nature of the clinics' operations, and Ross further argues that there was insufficient proof of the existence of a pattern as required under RICO.
 
 
 12
 In determining whether the evidence was sufficient to convict the defendants, "we must view the evidence in the light most favorable to the government and construe all possible inferences in its favor." United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir.1986); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). In making this determination, we do not engage in piecemeal review, but rather, we review the evidence as a whole. United States v. Carson, 702 F.2d 351, 362 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Moreover, the government may prove membership in a conspiracy by circumstantial evidence alone, United States v. Miranda-Ortiz, 926 F.2d 172, 176 (2d Cir.), cert. denied, 502 U.S. 928, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991), and a defendant may be convicted of conspiracy even though he is unaware of all the conspiracy's unlawful aims, as long as he has knowledge of some of those aims, see United States v. Lanza, 790 F.2d 1015, 1022-23 (2d Cir.), cert. denied, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). Finally, the government can prove knowledge by showing that "the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." United States v. Rodriguez, 983 F.2d 455, 458 (2d Cir.1993).
 
 A. Evidence of Knowledge
 1. Williams
 
 13
 Williams argues that the evidence presented at trial was insufficient to prove that she had knowledge of the scheme to defraud Medicaid. We disagree. The leader of the enterprise, Mohammed Sohail Khan, testified that Williams was aware of his relationship with Clin Path and that she agreed to pay him forty percent of her Medicaid receipts. To this end, Williams entered into a bogus lease agreement under which she agreed to pay Khan $1500 per week for rent. Khan also testified that, in May of 1991, he was notified that he and all the physicians were to be excluded from Medicaid. He said that when he told Williams that he was going to close the clinics because he did not "want to be a front anymore," she volunteered to take over as the "front," with Khan paying her expenses from the money that he received from Clin Path. The clinics remained in operation until July of 1991, when Clin Path lost its certification from Medicaid.
 
 
 14
 Other co-conspirator evidence inculpating Williams included the testimony of Dr. Sadaphal, who testified that she became concerned when she realized that all the patient charts had remarkably similar diagnoses. When Sadaphal asked Williams about these similarities, Williams "misled" her by claiming that the similarities were representative of the community in which the clinics were located. Also, a patient named Larita Mitchell testified that she gave the receptionist a list of fake ailments and then met with Williams in an examination room. Mitchell said that Williams did not ask her any questions and did not perform a medical exam and, after a short while, Williams simply told Mitchell to "go next door and take blood." After giving blood, Mitchell obtained her prescription and left; she had the prescription filled and sold the drugs on the street.
 
 
 15
 Williams argues that Mitchell was not credible because she was a crack addict and falsely testified that she recalled meeting Dr. Williams because it was the same day she took her son to the Boy Scouts when there was no Boy Scouts meeting. The government conducted a painstaking investigation into allegations that Ms. Mitchell's testimony was perjured. The results were inconclusive, but in any event there is no evidence that the government had knowledge of any perjury when it proffered Ms. Mitchell as a witness. Moreover, Ms. Mitchell's credibility was vigorously disputed before the jury. The jury, after hearing this testimony, was permitted to assess the credibility of these witnesses and to draw reasonable inferences. See Lanza, 790 F.2d at 1019.
 
 
 16
 The government also presented expert testimony indicating that the number of similar diagnoses was "statistically not possible." Finally, evidence of the lack of medical supplies at the clinics and of the presence of signs discouraging repeat visits was put before the jury. All this evidence supplied the jury with enough evidence to allow a reasonable juror to conclude beyond a reasonable doubt that Williams knew of the fraud, see id., or that Williams consciously avoided confirming its existence, see Rodriguez, 983 F.2d at 458.
 
 2. Khalil
 
 17
 Khalil contends that, because she rarely was at the clinics and took no active role in the medical care given there, the evidence was not sufficient for a jury to find that she had the requisite knowledge of the criminal nature of the scheme. This contention is without merit.
 
 
 18
 First, Khalil urges this court to discredit Khan's testimony. However, the credibility of witnesses is the province of the jury and we simply cannot replace the jury's credibility determinations with our own. See United States v. Losada, 674 F.2d 167, 173 (2d. Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).
 
 
 19
 Second, the fact that Khalil rarely was present at the clinics simply highlights the reasonableness of the jury's inference that a physician who received substantial remuneration for doing almost no medical work or supervision is aware of the fraudulent nature of her conduct. Khalil received $138,816 from Medicaid during her seven-month association with the clinic. Furthermore, there was evidence that Khalil made several conflicting statements regarding the amount of time she spent at the clinics doing work and whether she actually treated patients or merely supervised the PAs. The government also presented expert testimony indicating that the medical and blood tests ordered for Khalil's patient's were medically unnecessary. This evidence was sufficient for reasonable jurors to infer knowledge beyond a reasonable doubt.
 
 3. Lo
 
 20
 Lo also argues that there was insufficient proof that he knew of the fraudulent nature of the scheme. Again, we disagree. The evidence showed that Lo was associated with the Khan enterprise from July to December 1990, at which time he was barred from the Medicaid program. During this period, he received over $100,000 for doing essentially no work. In addition, when Medicaid requested an exit conference in which Lo could explain his billings, he failed to appear. As with the other defendants, the government presented expert testimony establishing the facially fraudulent nature of Lo's patient documentation. Finally, there was testimony that, when a PA was diagnosing men with a condition commonly occurring in women, Lo, without seeing any patients, brought this discrepancy to the PA's attention and provided an alternative diagnosis that would allegedly justify the ordered medication.4. Ross
 
 
 21
 Ross contends that the evidence was insufficient to establish his knowledge of the clinics' fraudulent nature. His contention also is without merit. Aside from the expert testimony indicating the fraudulent nature of Ross' patients' charts, there was specific evidence of Ross' knowledge. Ross was present at the clinic for approximately three days each week, and therefore had ample opportunity to observe the utterly inadequate facilities. In addition, he met with staff members in the area where signs were posted indicating that only new patients were welcome. Finally, in March of 1991, after a DSS representative had taken custody of twenty of Ross' files, Ross sent a letter to his PA directing that a certain drug be prescribed only when the condition for which it should be prescribed is present. The timing of this letter in connection with the DSS audit is evidence that Ross wrote the letter to cover his tracks. Ross left the clinic shortly after this incident.
 
 
 22
 Ross also chose to testify at trial. "By taking the stand and offering his own version of events, [the defendant] waives any claim as to the sufficiency of the Government's case considered alone." United States v. Friedman, 998 F.2d 53, 57 (2d Cir.1993) (internal quotations omitted). Ross testified at trial that he had no knowledge of the fraud at the Khan clinic, and the jury obviously rejected this testimony. Under Friedman, the jury was entitled to consider Ross' credibility in determining his knowledge.
 
 
 23
 Moreover, the evidence also was consistent with conscious avoidance. When Ross was informed that all of the patients came in with the same complaints, he did nothing. When the PA suggested to Ross that he speak to Khan about a nonsensical prohibition on urinalysis, Ross did nothing. This, and the evidence mentioned above, is consistent with awareness of a high probability of the criminal nature of the scheme and the decision to avoid confirming its criminality. See Rodriguez, 983 F.2d at 458.
 
 B. Pattern of Racketeering
 
 24
 Ross argues that, because he was at the Khan clinics for no more than nine weeks, his conduct cannot amount to a pattern of racketeering activity. We disagree. To demonstrate "a pattern of racketeering activity" under 18 U.S.C. Sec. 1962(c), the government must prove "relatedness" and "continuity or a threat of continuity." United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.) (in banc), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).
 
 
 25
 Relatedness can be established by showing that the predicate acts had "the same or similar purposes, results, participants, victims, or methods of commission." Id. at 1382 (internal quotations omitted). In this case, all the predicate acts of mail fraud were performed in the same way with the same purpose--to defraud Medicaid. Accordingly, relatedness was clearly established in this case.
 
 
 26
 In regard to continuity, the Supreme Court has noted that "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989). The entity, moreover, may be a legitimate business that regularly engages in illicit activity. See id. at 243, 109 S.Ct. at 2902-03. In light of these principles, it seems clear that there was a "threat of continuity" present here, because the clinics regularly engaged in defrauding Medicaid.
 
 II. EVIDENTIARY CLAIMS
 
 27
 Although several defendants challenge various evidentiary rulings made at trial, only Williams' claim warrants discussion here. Williams argues that the substance of two telephone conversations that she had with DSS representatives, and reports of those calls, were admitted improperly at trial. We find that the district court did not abuse its discretion in receiving this evidence because there was adequate circumstantial evidence to establish its reliability.
 
 
 28
 The first telephone call involved Virginia Hale, a DSS representative. Hale testified that, on June 26, 1990, DSS received a provider enrollment application from Williams. Williams does not challenge the fact that she signed and submitted the form, which included a telephone number where she could be contacted. Hale placed a call to that number, which turned out to be one of the Khan clinics, and left a message for Williams to call her back. Later that day, Hale received a telephone call from a woman who identified herself as Williams, and who confirmed the address where the Medicaid checks were to be sent and provided information about one of the clinics. The person also stated that she would check with her "partner" to see if the clinic at which she would be working was certified in New York State. Hale made a written record of the conversation.
 
 
 29
 The second phone call was described by Anna Graham, who worked with Hale at DSS. Graham testified that on June 28, 1990, she received and made a written record of a telephone call from a woman who identified herself as Williams. During the conversation, the woman stated that the clinic would be licensed as a private office, and that she wanted to enroll as an individual provider.
 
 
 30
 Williams objected to the admission of the testimony, claiming that there was an insufficient foundation to demonstrate that she was the person making the calls. Authentication generally requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). While a mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity, some additional evidence, which "need not fall in[to] any set pattern," may provide the necessary foundation. Fed.R.Evid. 901(b)(6), Advisory Committee notes, example 6. "[S]elf-identification of the person called at a place where he reasonably could be expected to be has long been regarded as sufficient" for authentication purposes. O'Neal v. Morgan, 637 F.2d 846, 850 (2d Cir.1980) (emphasis supplied), cert. denied, 451 U.S. 972, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981). On the other hand, self-identification by a person who makes a call, alone, is insufficient for authentication purposes, especially where there are other members of a conspiracy who could have made the call. See United States v. Zane, 495 F.2d 683, 696-97 (2d Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). In this case, it is alleged that Williams made the telephone call. Hence, the question becomes whether the circumstances adequately established that Williams was more likely than not the caller. We believe that they do.
 
 
 31
 First, the calls in question were made in response to a call by Hale to a number that Williams had provided. Hale left a message for Williams and received a return telephone call the same day. Usually, people provide telephone numbers where they reasonably believe they can receive a message. See Noriega v. United States, 437 F.2d 435, 436 (9th Cir.) (call made by defendant properly authenticated where defendant provided witness with a number, witness left message for defendant and defendant returned the call), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971). Hence, the circumstances indicate that Williams believed she would receive messages that were left at that location. Second, during this period, there is no question that Williams was seeking the Medicaid provider number that she eventually received, indicating her strong interest in returning the call. Third, the caller provided Williams' father's address as the address to which Medicaid payments should be sent. These circumstances provide a sufficient basis to admit the telephone calls.
 
 III. THE JURY CHARGE
 A. Balancing Language
 
 32
 Williams and Ross argue that the conscious avoidance charge to the jury was fatally flawed because it failed to include balancing language. Because they failed to raise this claim at trial, we review it for plain error. See United States v. Civelli, 883 F.2d 191, 194 (2d Cir.), cert. denied, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). In United States v. Feroz, 848 F.2d 359, 360 (2d Cir.1988) (per curiam), we said that a "conscious avoidance" charge should indicate to the jury that "knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist." We have cautioned prosecutors in this circuit to "request that the 'high probability' and 'actual belief' language be incorporated into every conscious avoidance charge." Id. at 361.
 
 
 33
 Here, the prosecutor requested that the "actual belief" language be included in the charge, but the trial court failed to comply with the request. The court, however, did include the "high probability" language in the charge. Moreover, the court explained that "the necessary knowledge cannot be established by a showing that a defendant was careless, negligent, or foolish." While the court failed to give the preferred charge, the charge as given did not constitute plain error "going to the very essence of the case." See United States v. Bradley, 812 F.2d 774, 778 (2d Cir.) (internal quotations omitted), cert. denied, 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987).
 
 B. Constructive Amendment
 
 34
 Williams and Ross claim that the jury charge constructively amended the indictment in violation of the Fifth Amendment by changing the nature of the fraud scheme and the RICO enterprise. We disagree. An indictment is constructively amended when the evidence admitted at trial and the jury instructions create a substantial likelihood that the defendant was convicted of an offense not charged in the indictment. See United States v. Miller, 471 U.S. 130, 136-40, 105 S.Ct. 1811, 1815-17, 85 L.Ed.2d 99 (1985). Where the evidence or jury instructions narrow an offense that is more broadly contained in the indictment, however, the indictment is not constructively amended in violation of the Fifth Amendment. Id. at 136, 105 S.Ct. at 1815.
 
 
 35
 Williams argues that the indictment was amended because the scheme alleged in the indictment focused on the prescription of unnecessary drugs to patients who then sold them on the street, whereas the evidence and charge focused on the billing of Medicaid for unnecessary medical procedures. The indictment, however, clearly indicated that the physicians' role in the fraud consisted of fraudulently billing Medicaid and therefore was not constructively amended.
 
 
 36
 Williams and Ross also argue that the charge amended the indictment because the indictment mentioned Ridgewood Pharmacy, Manhasset Community Management Service, and Manhasset Diagnostic as part of the scheme, whereas the evidence and charge focused on the four clinics. Khan testified that he was affiliated with Ridgewood Pharmacy and that fraudulent prescriptions would be filled there. The two other entities were set up by Khan and received the lease payments from the defendant-physicians. All these entities thus were related to the scheme. Moreover, even if the evidence at trial and the charge to the jury led to the conviction of the physicians solely on the basis of their relationships with the clinics, the conviction would be for a narrower offense than that contained in the indictment. Therefore, the defendants could not have been convicted for offenses that were not charged in the indictment. See id.; see also United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir.) (no constructive indictment where "nothing new was added to [the] indictment"), cert. denied, --- U.S. ----, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994).
 
 IV. SENTENCING ISSUES
 
 37
 Defendants raise numerous challenges to their sentences. The district court calculated the loss component of each physician's offense level by determining the fee charges attributed to the respective physician's Medicaid provider number. Beginning with a base offense level of 6, U.S.S.G. Sec. 2F1.1, the court adjusted upward according to the loss incurred by the fraud. The loss amounts and corresponding resultant levels were as follows: Williams, $1,814,896 for an increase to level 18; Khalil, $1,931,992 for an increase to level 18; Lo, $1,319,146 for an increase to level 17; Ross, $776,414 for an increase to level 16. Each physician then received a two-level enhancement for more than minimal planning, see U.S.S.G. Sec. 2F1.1(b)(2)(A), and a two-level enhancement for abuse of a position of trust, see U.S.S.G. Sec. 3B1.3. The district court also imposed a two-level enhancement on Ross for obstruction of justice, based on the finding that Ross had perjured himself at trial. See U.S.S.G. Sec. 3C1.1. The resultant levels and corresponding guidelines ranges were: Williams, Khalil, and Ross, level 22 (forty-one to fifty-one months), and Lo, level 21 (thirty-seven to forty-six months). Each physician was then sentenced at the bottom of the applicable range.
 
 A. Foreseeability of Loss/Inclusion of Loss
 
 38
 Williams, Khalil, and Ross claim that the district court erred in finding that the reasonably foreseeable losses included all services that were billed to their Medicaid provider number. We disagree. The district court found that no medical care whatsoever was administered at the clinics and that all the billings were fraudulent. Based on the record in this case, the court's findings are not clearly erroneous. See 18 U.S.C. Sec. 3742(e).
 
 B. Khan's Challenge to the Upward Departure
 
 39
 Khan argues that the district court erred in departing upward from his guidelines range. This argument is without merit. A sentencing court may impose a sentence outside the guidelines if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. Sec. 3553(b); see U.S.S.G. Sec. 5K2.0. The district court must first determine whether certain factors may warrant a departure, a determination that we review de novo, see United States v. Rogers, 972 F.2d 489, 492 (2d Cir.1992). Once it has been established that certain circumstances may warrant a departure, the district court has "wide discretion" in determining whether to depart. See United States v. Colon, 905 F.2d 580, 584 (2d Cir.1990).
 
 
 40
 Khan's original guidelines range was forty-six to fifty-seven months in prison. The district court then delineated three grounds for imposing an upward departure. First, the court noted that the guidelines failed to adequately account for the enormous health risks posed by the scheme. Second, it noted that this scheme undermined the public's confidence in government systems like Medicaid to the detriment of Medicaid recipients. Third, the court was concerned with Khan's role in inducing doctors to abuse their positions of trust. After upwardly departing to an offense level of thirty-two and a corresponding guidelines range of 121 to 151 months, the court granted the government's request for a downward departure, pursuant to section 5K1.1, and sentenced Khan to sixty months in prison. Each departure will be discussed in turn.
 
 
 41
 In circumstances where the financial loss "does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted," particularly where "the fraud caused or risked reasonably foreseeable, substantial non-monetary harm." U.S.S.G. Sec. 2F1.1, comment 10(a). Here, the court found that the scheme created a substantial health risk to patients, most of whom were alcoholics or drug addicts, because the clinics administered medical exams and dispensed prescription drugs without regard to the patients' needs. This resulted in uniformly poor medical treatment to a population that sorely needed treatment. These factors clearly warranted a departure.
 
 
 42
 The effect on Medicaid was also appropriately used as a basis for departure. U.S.S.G. Sec. 5K2.7 identifies "disruption of a governmental function" as a factor that may warrant an upward departure. Here, the district court found that the scheme not only disrupted the government's function of efficiently administering Medicaid, but also undermined the public's confidence in government. These factors were not adequately taken into account by the Sentencing Commission. See United States v. Flinn, 987 F.2d 1497, 1499, 1504-05 (10th Cir.1993). Accordingly, the district court properly considered these factors as grounds for a departure.
 
 
 43
 The departure based on Khan's role in inducing others to abuse positions of trust also was appropriate. Khan initiated this scheme and put his organizational skills behind it. Although he received an enhancement under section 3B1.1(a) for being the organizer or leader of the scheme, the district court found that the guidelines did not adequately take into account his role in inducing the doctors to breach their positions of trust. We find that this case is not in the heartland of conspiracies to defraud and thus that the court's reliance on this factor as a basis for departure was proper.
 
 
 44
 In regard to the district court's discretion to depart under the circumstances of this case, we find that the court did not abuse its discretion by departing for each of the three factors discussed above.
 
 C. Consideration of Section 3664 Factors
 
 45
 Williams, Ross, Lo and Khalil argue that the district court abused its discretion by failing to consider the financial resources of the defendants and the needs of the defendants' dependents, as required under 18 U.S.C. Sec. 3664, when imposing restitution. We agree. Section 3663(a) provides that the district court, in sentencing a defendant, may order that the defendant make restitution to any victim of such offense. Section 3664(a) provides that in determining whether to order restitution and its amount, the sentencing court
 
 
 46
 shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
 
 
 47
 "[T]here is no requirement that specific findings be made on each factor," United States v. Gelb, 944 F.2d 52, 56 (2d Cir.1991), and the defendant bears the burden of proof as to these factors, 18 U.S.C. Sec. 3664(d). Nevertheless, "the record must demonstrate that the court has considered these factors in ordering restitution." United States v. Tortora, 994 F.2d 79, 81 (2d Cir.1993).
 
 
 48
 Here, the amount of restitution ordered by the district court is equivalent to the loss occasioned by each defendant. The record does not indicate whether the court considered the financial resources of the defendants or the financial needs and earning ability of the defendants and their dependents. It appears that the district court simply "identified the amount owed ... and imposed [the] full amount" on the defendants, and this is an abuse of discretion. See Tortora, 994 F.2d at 81. Thus, we must remand for the district court to consider the statutory factors that bear on the issue of restitution. Upon remand, the court may consider the amount of forfeiture each physician-appellant was ordered to pay as well. See United States v. Porcelli, 865 F.2d 1352, 1355, 1364-65 (2d Cir.), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).
 
 
 49
 The district court ordered that defendants Williams, Khalil, and Lo make their restitution payments according to a schedule determined by the Probation Department as a special condition of their supervised release. However, we have recently held that the sentencing court cannot "authoriz[e] a probation officer to make post-sentencing decisions as to either the amount of restitution, or the scheduling of installment payments." United States v. Porter, 41 F.3d 68, 71 (2d Cir.1994) (citations omitted). Therefore, the district court must revise its restitution orders to comply with our ruling in Porter. The district court also authorized the Probation Department to schedule the payments for Khan's restitution order. Accordingly, we remand that portion of Khan's sentence to allow the court to comply with Porter. See id.
 
 
 50
 As to defendant-appellant Jacqueline Otero, we grant only so much of the government's motion for summary affirmance as relates to her conviction and to her sentence in regard to the district court's determination of loss attributable to her and the imposition of a two-point enhancement for more than minimal planning, see U.S.S.G. Sec. 2F1.1(b). We deny so much of the government's motion for summary affirmance as relates to the restitution order in which the court authorized the Probation Department to set a schedule of payments. As discussed above, this practice is contrary to our ruling in Porter, 41 F.3d at 71, and we therefore remand for the district court to determine her schedule of payments of restitution. We also deny the motion of Otero's attorney to be relieved from representing Otero on this appeal. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).
 
 
 51
 We have considered all of the defendants' other arguments as well as their motions in this court and find them to be without merit.
 
 CONCLUSION
 
 52
 For the foregoing reasons, the case is remanded for the district court to consider the section 3664(a) factors on the record regarding the restitution ordered for defendants Williams, Ross, Lo, and Khalil, and to revise the restitution orders regarding the schedule of payments to comply with Porter, 41 F.3d at 71. In all other respects the judgments of conviction and sentence are affirmed.
 
 
 
 [1]
 Defendant-appellant Jacqueline Otero also pleaded guilty. Before us is a motion by the government for summary affirmance of her conviction and sentence and a motion by her attorney to be relieved of the duty of representation. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)
 
 
 [2]
 There was evidence that Williams saw some patients on Saturdays, but she also "supervised" PAs during the week, even though she was not present at the clinics during that time