Cheryl **ARCHER,** Angela Bryant, Timothy Green, Christina Guzman, Mary Hewitt, Carol Lynch and Neal Thompson, Plaintiffs,

v.

**ECONOMIC OPPORTUNITY COMMISSION OF NASSAU COUNTY INC.,** Roosevelt Community Action Program, Inc., Roosevelt Head Start Child Development Program, Manhasset Great Neck Community Action Program, Long Beach Community Action Program, Long Beach Head Start Child Development Program, Martin Luther King Scholarship Fund, the Nassau County Democratic Committee, the Friends of Fred Brewington, John Kearse, Wilbur McCall, Iris Johnson, Jean Love, Jean Davis, Carrie Lewis, Lawrence Burns, Levena Diamond, Stephanie Chenault, Yvette Wright and R. William Cooper, **Defendants.**

Bertha Ortega, Plaintiff,

v.

Economic Opportunity Commission of Nassau County, Hempstead Community Action Program, Martin Luther King Scholarship Fund, the Nassau County Democratic Committee, the Friends of Fred Brewington, Iris Johnson, John Kearse, Wilbur McCall, Gregory Navarro and Carrie Tiller, Defendants.

Nos. 96 cv 598, 96 cv 2712.

United States District Court, E.D. New York.

Dec. 23, 1998.

602

John Gianfortune, Garden City, NY, for Cheryl Archer, Angela Bryant, Timothy Green, Christina Guzman, Mary Hewitt, Carol Lynch, Neal Thompson, plaintiffs.

L. Susan Slavin, Slavin & Steinberg, Huntington, NY, for Bertha Ortega, plaintiff.

Mark Mulholland, Ruskin, Moscou, Evans & Faltischek, Mineola, NY, for defendants.

### *Opinion and Order*

GERSHON, District Judge.

Plaintiffs, Bertha Ortega ("Ortega"), Cheryl Archer ("Archer"), Angela Bryant ("Bryant"), Timothy Green ("Green"), Christina Guzman ("Guzman"), Mary Hewitt ("Hewitt") and Carol Lynch ("Lynch") are former employees of the Economic Opportunity Commission of Nassau County, Inc. ("EOC"), a private, not-for-profit anti-poverty organization. Defendants are the EOC; two Nassau County Head Start programs that are delegate agencies and programs of the EOC; three Nassau County Community Action Programs ("CAP"s), also delegate agencies and programs of the EOC; the Martin Luther King Scholarship Fund, a scholarship fund created and run by the EOC; John Kearse, Chief Executive Officer of the EOC; Wilbur McCall, Deputy Director of the EOC; Iris Johnson, Executive Director of the Heampstead CAP and assistant to the CEO; Carrie Lewis, Roosevelt Head Start supervisor; Stephanie Chenault, Manhasset/Great Neck Head Start supervisor; William Cooper, Director of the Roosevelt CAP; Gregory E. Navarro, Associate Director of the EOC; Carrie Tiller, Community Organizer Supervisor of the EOC; and Jean Love, Jean Davis, Lawrence Burns, Levena Diamond, and Yvette Wright, EOC employees with supervisory authority over one or more of the plaintiffs.[1]

---

1. Plaintiffs have voluntary dismissed all claims against the Nassau County Democratic Committee and the Friends of Fred Brewington Campaign Committee.

Plaintiffs allege that, during their employment at the EOC, they were required to register voters and to participate in political campaign activities on their own time, even though these duties were not included in their employment descriptions. Plaintiffs further allege that they were threatened—with termination and/or the denial of their paychecks—into making contributions to the CAP fund and to the annual EOC fundraiser, the Martin Luther King Jr. Dinner Dance ("MLK Dance"). Finally, plaintiffs maintain they were fired solely because they refused to buy tickets to the 1996 MLK Dance. Plaintiff Bryant also asserts that she was sexually harassed by defendants Cooper and McCall.

Plaintiffs filed this action in 1996 claiming civil rights violations pursuant to 42 U.S.C. § 1983 and § 1985, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a) ("RICO"), and RICO conspiracy pursuant to 18 U.S.C. § 1962(d). Specifically, plaintiffs claim that defendants violated their rights to due process and to freedom of association under the First and Fourteenth Amendments to the United States Constitution, subjected them to involuntary servitude in violation of the Thirteenth Amendment, and conspired to deprive them of equal protection of the laws, in violation of the Fourteenth Amendment. Additionally, plaintiffs assert breach of contract, wrongful discharge, conversion and state constitutional claims pursuant to the doctrine of supplemental jurisdiction. Plaintiff Bryant also brings claims under Section 1983; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681; and state law claims for assault and battery, negligence, and intentional infliction of emotional distress against various defendants based on the alleged sexual harassment by Cooper and McCall.

Defendants move for partial summary judgment (1) dismissing plaintiffs' RICO conspiracy claim on the ground that they have failed to present evidence of an agreement; (2) dismissing their civil rights claims under Sections 1983 and 1985 on the ground that the EOC is not a state agency and, thus, was not acting under "color of law"; (3) dismissing plaintiffs' breach of contract claim because they were at-will employees; and (4) dismissing Bryant's claim for intentional infliction of emotional distress as deficient under New York law.

## DISCUSSION

Motions for summary judgment are granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The facts will be treated in the discussions of each claim. If not otherwise noted, the facts are undisputed.

### I. Constitutional Claims: State Action

Defendants argue that plaintiffs' constitutional claims under Sections 1983 and 1985 must be dismissed because plaintiffs have failed to demonstrate state action. Plaintiffs contend that, because the EOC and its local CAPs rely on public funding, and because they carry out functions that are governmental in nature, they should be considered state actors.

Private individuals and entities are not normally liable for violations of rights secured by the United States Constitution. In order to maintain a claim based on alleged constitutional violations, a plaintiff must show that the actions complained of are "fairly

attributable" to the government. *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The Supreme Court has developed several formulations to determine whether an action is taken under color of state law. Plaintiffs bear the burden of proving state action under each of these tests. *See Scheiner v. Wallace*, 860 F.Supp. 991, 999 (S.D.N.Y.1994).

■■■ The "symbiotic relationship" test, established by the Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), asks whether "[t]he State has so far insinuated itself into a position of interdependence with [the organization] ... that it must be recognized as a joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. 856. Plaintiffs maintain that, since the EOC and its CAP programs receive more than 95% of their funding from government agencies, and since the CAP programs are subject to federal regulation, the EOC is essentially an instrumentality of the State. Plaintiffs' arguments are without merit. The United States Supreme Court has repeatedly held that a private entity's dependence on government funding does not make the organization a state actor. *See e.g., Rendell–Baker*, 457 U.S. at 840, 102 S.Ct. 2764 (public funding accounted for at least 90% of school's income). Extensive state regulation is also insufficient unless the contested action is compelled or influenced by such regulation. *Id.* at 841, 102 S.Ct. 2764. Plaintiffs have not provided any evidence that their discharge was compelled or influenced by a state-created regulation.

■■■ The "state compulsion" test requires that a state "exercis[e] coercive power or ... provid[e] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Plaintiffs contend that, since one third of the EOC's Board of Directors ("Board") is comprised of government officials,[2] and since the Board and the Board's Personnel Committee ("Committee") are authorized to make personnel decisions, government officials had a direct involvement in the decision to fire plaintiffs.

The "Contract and Manual of Operations and Procedures for Community Action Programs in Nassau County" ("Contract"), which governs the relationship between the EOC and its local CAPs, vests full authority for hiring and firing CAP employees in the CAP program directors. However, plaintiffs have provided evidence that defendant Kearse ordered the CAP program directors to terminate them and that he received the consent of the Board. In a memorandum to the Board members dated January 25, 1996, Kearse implied that all employees who did not attend the dance would be terminated. He further stated: "Please report this to your local Board of Directors, organizations and agencies whom you represent on the Board of Directors of the EOC. Their [termination] letters will state 'they have demonstrated an inability or unwillingness to conform to the priorities of the EOC and its unique program of services.'" The Board unanimously supported Kearse's decision during a meeting on January 25, 1996. And, each of plaintiffs' termination letters, six of which were written by defendant Cooper, director of the Roosevelt CAP, and one of which was written by Iris Johnson, director of the Hempstead CAP, repeated Kearse's language word for word. Thus, viewing the evidence in the light most favorable to plaintiffs, plaintiffs have raised a factual issue as to whether the Board knew of and supported Kearse's decision and whether the CAP directors followed Kearse's order.

Nonetheless, the link between the decision to terminate plaintiffs and the government officials sitting on the EOC Board is too attenuated to support a finding of state action. The mere acceptance of Kearse's decision is insufficient. *See Crowder v. Conlan*, 740 F.2d 447, 451 (6th Cir.1984) (no nexus between public board members and chal-

---

**2.** The government officials who were sitting on the EOC Board of Directors when plaintiffs were terminated were: Bill Hamilton of the Department of Social Services, Herman Tibbs from the Department of Drugs and Alcohol, Gus Rivera from Nassau County Community College and Helen Morgan, the Uniondale Representative at Large.

lenged decision because board merely accepted medical judgments reached by staff physicians and hospital reviewing committees). *See also Gilmore v. Salt Lake Community Action Program,* 710 F.2d 632, 636 (10th Cir.1983) (though one third of board of trustees was comprised of government officials, no substantial allegations that government influenced personnel decision). *Cf. Downs v. Sawtelle,* 574 F.2d 1, 7–8 (1st Cir.), *cert. denied* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978) (state action found where town government appointed entire board of directors of community hospital); *Jackson v. Statler Foundation,* 496 F.2d 623, 635 (2nd Cir.1973) (state action could be found in racial discrimination case where public officials controlled the selection of a majority of the governing body of a charitable foundation). These cases make clear that tangential government involvement and the exercise of government power must be distinguished. Although the government officials sitting on the Board approved of Kearse's termination decision, plaintiffs have not provided any evidence that they influenced or exercised control over that decision. In fact, not one government official spoke in support of—or even about—Kearse's decision at the January 25th board meeting. In sum, that public officials sit on the Board does not establish that the decision to discharge plaintiffs was a decision of the state.

■ Plaintiffs further contend that, because the EOC operations manual, "A Manual of Operations and Procedures for the Economic Opportunity Commission" ("Manual"), was developed and created under the mandate of government officials, and because any amendments to the Manual can only be made with the approval of the government, the government has direct control over the EOC's actions. However, the link between the government officials who approved the Manual and the EOC employees who fired plaintiffs is also too attenuated. Regardless of the EOC's reason for terminating plaintiffs, the Manual did not require plaintiffs' termination. The decision to discharge plaintiffs was made by Kearse and carried out by his employees. *See Blum,* 457 U.S. at 1008, 102 S.Ct. 2777 (decision to discharge patients ultimately turns on medical judg-

ment made by a private party not on regulations governing the level of care); *Cf. Catanzano v. Dowling,* 60 F.3d 113, 119 (2d Cir. 1995) (home health care agency "deeply integrated" into state regulatory scheme and its treatment decisions influenced by state regulations).

■ Finally, to be considered a state actor under the "public function" test, the entity must perform a function that is "traditionally the exclusive prerogative of the state." *Rendell–Baker* 457 U.S. at 842, 102 S.Ct. 2764 (citation and quotation omitted). The EOC operates a federally-funded and regulated Head Start Education Program, provides education and welfare services, acts as a liaison for clients to the federal and state social security and disability agencies, provides assistance with immigration applications to the INS, and distributes funds granted to the EOC by the Federal Emergency Management Agency. Though these projects serve the public, the services provided are not within the exclusive province of the State. *See id.* (education not exclusive prerogative of the state); *Blum,* 457 U.S. at 1011, 102 S.Ct. 2777 (nursing homes not exclusive prerogative of the state); *Morse v. North Coast Opportunities, Inc.* 118 F.3d 1338, 1342 (9th Cir.1997) (Head Start program not the exclusive prerogative of the government); *Nail v. Community Action Agency of Calhoun Co.,* 805 F.2d 1500, 1501–02 (11th Cir.1986) (same). The operation of a not-for-profit public service agency, even with the use of government funds, does not constitute state action. That the EOC performs its services pursuant to public contract does not change the analysis. "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *See Rendell–Baker,* 457 U.S. at 840, 102 S.Ct. 2764.

In sum, since the plaintiffs have failed to establish that the EOC and its local CAPs were acting under color of law, defendants are entitled to summary judgment on each of plaintiffs' constitutional claims.

## II. RICO Conspiracy

 To establish a Section 1962(d) RICO conspiracy, plaintiffs must provide evidence that defendants embraced the objective of a conspiracy and agreed to commit two predicate acts in furtherance of it. *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.), *cert. denied*, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). Membership in a conspiracy may be proven by circumstantial evidence. *United States v. Khan*, 53 F.3d 507, 513 (2d Cir.), *cert. denied*, 516 U.S. 1042, 116 S.Ct. 697, 698, 133 L.Ed.2d 655 (1996). "The law … permits inferences of … [conspiracies'] existence to be drawn from the conduct and speech of the actors." *United States v. Cassino*, 467 F.2d 610, 617 (2d Cir.), *cert. denied*, 410 U.S. 913, 93 S.Ct. 957, 959, 34 L.Ed.2d 276 (1973). Knowledge of a conspiracy may be established by showing knowledge of at least some of the conspiracy's unlawful aims. *United States v. Lanza*, 790 F.2d 1015, 1022–23 (2d Cir.1986), *cert. denied*, 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). And "there is no requirement that each member of a conspiracy conspire directly with every other member of the conspiracy." *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir.1988) (citation and quotation ommitted).

 Plaintiffs allege that the EOC, the local CAPs and the individual defendants conspired to (1) extort a portion of plaintiffs' salary every work period for the CAP fund;[3] (2) require plaintiffs to participate in campaign activities for the Voter Registration Information Committee, an entity established by the EOC, members of the NAACP, local churches and community members;[4] and (3) extort money from plaintiffs by requiring them to purchase tickets to the MLK Dance.[5] Defendants do not dispute that a question of fact exists regarding their alleged predicate acts. They argue only that plaintiffs have failed to raise a factual issue as to the existence of an agreement in that plaintiffs have no personal knowledge of any discussions or agreements among the alleged RICO conspirators.

Since, if defendants did conspire to extort money from plaintiffs, they necessarily conspired in private, it is unreasonable to expect that plaintiffs would have been present at, or even aware of, any secret meetings among the co-conspirators. Individual plaintiffs were reminded about the required contributions and the required participation in campaign activities by individual supervisors on various and separate occasions in ways suggesting concerted action and not simply identical but coincidental behavior. The existence of an agreement is further evidenced by the circumstances of plaintiffs' termination, *see* discussion *supra* p. 605. Plaintiffs' termination letters, which were signed by their CAP supervisors, Cooper and Johnson, repeated word for word the language from Kearse's January 25th letter to the Board, in which he implied that employees who failed to attend the MLK Dance would be discharged. Viewing the evidence in the light most favorable to the plaintiffs, they have raised a factual issue as to the existence of an extortion agreement between their CAP supervisors, the CAPs and the EOC.

## III. Wrongful Discharge and Breach of Contract

 As a preliminary matter, since New York courts do not recognize a common law

---

**3.** *See e.g.*, Deposition of Cristina Guzman (told by Davis during staff meetings of required contributions to the CAP fund); Deposition of Stephanie Chenault (acknowledging that employees were required to contribute to the CAP fund).

**4.** *See e.g.*, Deposition of Bertha Ortega (told by McCall and others to distribute flyers for various political candidates on different occasions); Deposition of Angela Bryant (required by Cooper to hand out fliers and gather signatures for the Fred Brewington campaign, required by McCall and Cooper to register two voters per pay period in order to receive her pay check, told by Cooper that she would be fired if she did not participate in campaign activities); Deposition of Leroy Felder (McCall strongly suggested to staff members that they had to work on the Brewington campaign).

**5.** *See e.g.*, Deposition of Angela Bryant (told by Cooper that McCall had required all employees to pay the full amount for tickets for the MLK Dance, and told she would be fired if she did not buy tickets); Deposition of Cheryl Archer (told by Cooper on one occasion and Davis on another that the EOC required everyone to pay the full price for a ticket to the MLK Dance); Deposition of Timothy Green (told by Cooper that Kearse and Johnson had required everyone to buy tickets to the MLK Dance).

tort of "wrongful discharge," *Leibowitz v. Bank Leumi Trust Co. of New York,* 152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989), plaintiffs' wrongful discharge claim is dismissed with prejudice.

In support of their breach of contract claim, plaintiffs allege that defendants violated their express contractual right to continued employment. Specifically, plaintiffs argue that their termination for refusing to buy tickets to the MLK Dance violated the procedures for termination set forth in the Manual. Defendants, however, contend that plaintiffs had no right to continued employment, but rather that they were employees-at-will, terminable at any time for any or no reason at all.[6]

In New York, absent an agreement establishing a fixed duration, an employment relationship is presumed to be at will. *Rooney v. Tyson,* 91 N.Y.2d 685, 694, 674 N.Y.S.2d 616, 697 N.E.2d 571 (1998); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). Employees-at-will can be terminated for any reason " 'absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment. . . .' " *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 851 (2d Cir. 1985), *quoting Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). In *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), the New York Court of Appeals found an express limitation where: (1) plaintiffs left their prior employment because their new employer assured them that they would not be discharged without cause; (2) the assurance was incorporated into the employment application; (3) plaintiffs rejected other job offers in reliance on the new employer's assurance of continued employment; and (4) the handbook and policy manuals stated that plaintiffs could be discharged only for just cause.

The Court of Appeals for the Second Circuit and trial courts within the Circuit have interpreted *Weiner* broadly. "If *Weiner* stands for anything, it stands for the proposition that the merits of a claim alleging breach of an employment contract are not to be determined by an application of a formula or checklist; instead the totality of facts giving rise to the claim must be considered." *Gorrill,* 761 F.2d at 853. *See Wolde–Meskel v. Tremont Commonwealth Council TCC,* 1994 WL 167977 at *3–5. In *Mycak v. Honeywell, Inc.,* 953 F.2d 798 (2d Cir.1992), the Second Circuit held that the at-will presumption does not apply when an employer has promulgated policies in a personnel manual specifying procedures or grounds for termination; rather, such procedures or grounds become part of the employment contract and must be followed. *Id.* at 801. *See also Wolde–Meskel* 1994 WL 167977 at *5.

Since *Mycak,* courts have held that a manual that lists certain grounds for termination, but does not expressly exclude others, cannot as a matter of law be construed as limiting the employer's right to fire an employee. *See, e.g., Tanzini v. Marine Midland Bank, N.A.,* 952 F.Supp. 937, 945 (N.D.N.Y.1997); *Cucchi v. New York City Off–Track Betting Corp.,* 818 F.Supp. 647, 650 (S.D.N.Y.1993); *Melnyk v. Adria Laboratories,* 799 F.Supp. 301, 309 (W.D.N.Y. 1992); *Gmora v. State Farm Mutual Automobile Insurance Co.,* 709 F.Supp. 337, 341 (E.D.N.Y.1989). Here, the Manual clearly delineates procedures for terminating CAP employees; however, nowhere does it state that the list of situations warranting termination is exclusive. The section entitled "Terminations" states that "[d]uring the probationary period, the Program Director shall have the right to dismiss for cause and without any notice of dismissal . . . . After the probationary period, the Program Director shall have the right to dismiss employees for any of the reasons outlined below." The reasons stated include reorganization or retrenchment of the organization, unsatisfactory performance, malfeasance, public insubordination, acceptance of gifts or gratuities, improper use of commission or delegate agency property, improper disclosure of in-

---

**6.** Defendants deny that plaintiffs were fired for refusing to buy tickets to the MLK Dance, but decline to provide an alternative reason for plaintiffs' termination, stating that "the reasons behind the termination are irrelevant for this summary judgment motion."

formation, or unauthorized outside employment. There is no language, however, specifying that the above list is exhaustive.[7] And distinctions made between situations warranting termination during the probationary period and those warranting termination after the probationary period do not limit an employer's right to discharge at will. *See Tanzini,* 952 F.Supp. at 945; *Melnyk,* 799 F.Supp. at 309.

■ Moreover, plaintiffs have not established that they relied on the Manual in choosing to work for the EOC. Bryant, Lynch and Ortega have conceded that they did not rely on the Manual; and Green, Archer, Hewitt and Guzman have not provided any evidence that they were notified of a policy limiting the right to discharge or that they detrimentally relied on that policy in accepting employment. *See Castro v. Local 1199,* 964 F.Supp. 719, 730–31 (S.D.N.Y.1997) (no reliance where employee placed the manual in her drawer without looking at it). *Cf. Mycak,* 953 F.2d 798 (employment contract found where manual contained a specific policy and *plaintiff was aware* of manual's existence); *Kostaras v. United Airlines, Inc.,* 650 F.Supp. 576, 577 (S.D.N.Y.1986) (plaintiff turned down two job offers in reliance on manual's termination provisions). Because the Manual does not expressly limit EOC's right to terminate employees, and because plaintiffs have not shown that they relied on the Manual in choosing to work for the EOC, plaintiffs have failed to raise a factual issue as to the existence of an express limitation,

and their breach of contract claim fails as a matter of law.[8]

## IV. Intentional Infliction of Emotional Distress

■ Plaintiff Angela Bryant testified at her deposition that McCall, Deputy Director of the EOC, "hugged" her and "stuck his tongue down ... [her] throat" when she went to his office to report that she had been sexually harassed by Cooper, her boss. Bryant argues that McCall took advantage of her vulnerability and her trust in him and that McCall's unwanted sexual advances caused her to suffer severe emotional distress. As noted above, Bryant bases her claims against McCall on a variety of legal theories.

McCall seeks to dismiss Bryant's intentional infliction of emotional distress claim only. He argues that it does not meet the rigorous standard that the New York courts have imposed on such claims. The tort has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal link between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

---

**7.** Defendants argue in their reply brief that, even if plaintiffs could establish that the list is exhaustive, their breach of contract claim fails because they neglected to invoke the grievance procedures set forth in the section on "Terminations". The Manual explains that "[a]n employee may request a hearing before the Personnel Committee if he contends that he was not accorded proper procedure under these codes, and discussion with the Program Director does not resolve the matter." Defendants did not raise this argument in their initial memorandum, thereby denying plaintiffs the opportunity to respond. In any event, it is not necessary to consider whether plaintiffs invoked the grievance procedures since they were employees at will.

**8.** Plaintiffs Archer, Hewitt and Guzman, who were Head Start employees, also claim that their termination breached the provisions of federal

Transmittal Notice 70.2, which was issued pursuant to Public Law 90–22, December 23, 1967, Part B, Section 222(I)(B). Transmittal Notice 70.2 requires Head Start employers to consult with Head Start parents prior to terminating their employees. Guzman alleges that the parents were not consulted until after her termination, and Archer and Hewitt allege that the parents were not consulted at all. Plaintiffs' argument is meritless. Transmittal Notice 70.2 is intended to facilitate the involvement of Head Start parents "in order that parents may become more effective in bringing about positive change in the lives of their children." In other words, the notice is intended to protect the rights of Head Start parents, not staff; it does not give employees a right to parental involvement in termination decisions.

**610**

and utterly intolerable in a civilized community.'" *Id.* (citation omitted).

Typically, the intentional infliction of emotional distress theory has been applied, in sexual harassment cases, where there has been a continuing campaign of verbal and/or physical harassment. *See e.g., Bonner v. Guccione,* 916 F.Supp. 271, 278 (S.D.N.Y. 1996) (continuing course of demeaning verbal harassment to women held actionable as outrageous conduct); *Persaud v. S. Axelrod* Co., 1996 WL 11197 (S.D.N.Y.1997) (asking plaintiff on dates, commenting on her physical appearance, repeatedly touching her, once pulling a knife on her, and once pushing her against the wall constituted outrageous conduct); *Thanning v. Gulotta,* 898 F.Supp. 134, 140 (E.D.N.Y.1995) (touching and fondling plaintiff, inquiring about her sexual and social life, and insulting her, sometimes within earshot of her co-workers, satisfied outrageous conduct standard). *Cf. Nunez v. A–T Financial Information, Inc.,* 957 F.Supp. 438, 442 (S.D.N.Y.1997) (single occasion of verbal abuse, though reprehensible, when unaccompanied by physical contact or threats, held insufficient).

 Here, Bryant asserts a single incident of harassment, but one involving actual unwanted sexual contact by the very person to whom she had gone to complain of sexual harassment. As noted in the Restatement (Second) of Torts, § 46 (1965), the extreme and outrageous character of the conduct may arise from an abuse by the defendant of the particular relationship between the parties. More specifically, it has been aptly said that "[s]exual harassment on the job is undoubtedly an intentional infliction of emotional distress ... and harassment is probably more readily found in the acts of a supervisor than in the acts of acquaintances at a dinner party." W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 12, at 18 (1988 pocket part) (5th ed.1984). Whether the single incident asserted by Bryant, although undoubtedly reprehensible, rises to the extremely high level required under New York law to state a claim for intentional infliction of emotional distress is debatable. Since the question is a close one, I will not dismiss this theory, on the ground of insufficiency, before Bryant has the opportunity to present the full picture at a trial.

## CONCLUSION

Defendants' motion for summary judgment is granted as to plaintiffs' claims under 42 U.S.C. §§ 1983 and 1985 and their breach of contract and wrongful discharge claims. Defendants' motion for summary judgment is denied as to plaintiffs' claim of RICO conspiracy pursuant to 18 U.S.C. § 1962(d) and as to plaintiff Bryant's claim for intentional infliction of emotional distress.

**SO ORDERED.**