UNITED STATES of America, Appellee,

v.

John PASCARELLA, Mark D'Andrea, John Breheney, Defendants–Appellants.

Nos. 715, 716 and 784, Dockets 95–1213 (L), 95–1247 and 95–1250.

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1996.

Decided May 10, 1996.

Christine E. Yaris, New York City (Nancy A. Perry, New York City, of counsel), for Defendant–Appellant, John Pascarella.

Felix T. Gilroy, Staten Island, NY, for Defendant–Appellant, Mark D'Andrea.

Emily Daniel, New York City (Milner & Daniel, New York City, of counsel), for Defendant–Appellant, John Breheney.

Paul Weinstein, Assistant United States Attorney for the Eastern District of New York (Zachary W. Carter, United States Attorney, Emily Berger And Shari D. Leventhal, Assistant United States Attorneys for

the Eastern District of New York, of Counsel), for Appellee, U. S.

Before: NEWMAN, Chief Judge, MAHONEY and FRIEDMAN,* Circuit Judges.

FRIEDMAN, Circuit Judge:

The appellants Pascarella, D'Andrea and Breheney were convicted by a jury in the United States District Court for the Eastern District of New York (Glasser, J.) of conspiracy in violation of 18 U.S.C. § 371 and interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. Pascarella and D'Andrea also were convicted of bank fraud, in violation of 18 U.S.C. § 1344. The appellants challenge their convictions on various grounds. We affirm.

I.

Viewed in the light most favorable to the government, the evidence shows the following facts:

This criminal prosecution grew out of a conspiracy by the appellants and numerous others to steal and cash, according to the government's approximation, one-half million dollars in Ford Motor Company (Ford) rebate checks. Ford sends rebate checks to its dealerships around the country for issuance to purchasers of vehicles during promotional programs. The checks were for different amounts (frequently $2,000), had a blank space for the payee's name (which the dealer filled in), and were signed by Ford. Although the customers usually use the checks as a down payment on a vehicle, the checks are negotiable and may be cashed or deposited in customers' bank accounts. The checks here involved were stolen from Ford dealerships in New Jersey, where some of the conspirators worked, and transported to Staten Island, N.Y., where they were cashed or deposited in bank accounts.

The conspiracy began in the summer of 1992, when a co-defendant, George Bannon, stole rebate checks from Bannon's employer, Sansone Lincoln Mercury (Sansone), after

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Bannon was forced to leave his job there as a result of theft accusations. Although Bannon initially did not expect payment for the checks when he turned them over to co-defendant Jack Smith, the latter paid Bannon for them. Smith or his associates then cashed the checks on Staten Island at two check-cashing establishments. Over the next several months, Bannon continued to steal rebate checks from Sansone and several other Ford dealerships and turn them over to Smith for cashing.

As part of his efforts to obtain rebate checks for Smith, Bannon told James Fox about the scheme. Fox agreed with Bannon that they would split one-third of the value of any check that Fox obtained and gave to Bannon and that was cashed. Fox subsequently received money from Smith for checks Fox had obtained from Bannon.

Among the people at automobile dealerships to whom Fox spoke about obtaining rebate checks was Victor Vega, who then approached the appellant Breheney. Vega had worked previously with Breheney, both at automobile dealerships and in the gambling business—Breheney as a bookmaker and Vega as his "runner." Vega, with the help of another co-defendant, subsequently obtained rebate checks and gave them to Fox and Bannon. Vega expected to be paid about $60,000 for one batch of stolen checks, which he intended to split equally with Breheney and another conspirator.

Other members of the conspiracy made similar arrangements, thereby creating a network of New Jersey automobile dealership employees who stole rebate checks from their employers, and go-betweens who transmitted the checks to Fox, Bannon and Smith.

On receiving the stolen checks, Smith arranged for them to be cashed by a friend at a check-cashing agency. The appellants Pascarella and D'Andrea cashed stolen rebate checks that could be traced back to Smith and the co-defendants who stole the checks from the dealerships.

D'Andrea obtained $14,000 in stolen rebate checks from his business partner, Ronald Bartiromo. He tried to cash the checks, but upon learning from a bank employee that a cash transaction of more than $10,000 would trigger a government reporting requirement, he instead deposited the checks in his personal bank account. Later the same day, Bartiromo cashed three separate $3,800 checks drawn on D'Andrea's account, thereby again avoiding the reporting requirement. Several days later, when the bank discovered that the checks were stolen, D'Andrea repaid the $11,400.

Pascarella assisted his nephew in opening a bank account on Staten Island under a fictitious name, which was used to cash stolen rebate checks. He also cashed some checks himself through a local used car dealer.

When Ford discovered the theft of the checks, it stopped payment on them. After the banks refused to pay the stolen checks, the participants in both the check-stealing and check-cashing aspects of the conspiracy sought to collect the money allegedly due them.

On the check-stealing end, Vega began pressuring Bannon about payment for the checks. Breheney also spoke with Bannon on the telephone several times, stating that he had been told that the checks in fact had cleared and that he wanted his money. He and Vega made a series of calls to Bannon and others to determine what had happened to the checks.

Breheney also met with Smith, who gave him dishonored rebate checks to show that they had not cleared and explained that Bannon had been paid for the checks before they discovered that the checks were not clearing. Afterwards, Breheney told Vega that in the future they could turn over any rebate checks directly to Smith, without working through Bannon. Following this meeting, Smith and Breheney also became involved together in various gambling transactions.

On the check-cashing end, during the summer of 1993, Smith and his associates, including co-conspirators Gene Lamberti and Carl Benfante, began threatening Bannon and Fox and demanding that they return the money Smith had given them for the checks that later bounced. Benfante told Bannon that he wanted "his money," and said, "you don't want anything to happen. You don't

want to have to work with a broken arm or a broken leg. Just get me my money." Bannon finally paid a total of $16,800, although he stated that the checks for which he was paid were not the ones that did not clear. At one point, Lamberti told Bannon that "[y]ou have to think of checks as a loan, not that they are forever, and you're going to have to pay him back."

Fox also was asked to repay the money he had received for the checks. Fox refused to pay, however, and told Smith that "that's not the agreement you made." Another extorter told him, "it looks like we're going to have to come up there and rip your fucking arm off." He claimed that the money he received was for checks that had cleared.

Smith and his associates hired Vega and Breheney to locate Bannon and to lure Fox to a meeting with Smith and his associates in order to force them to return the money they had received. Breheney, through Vega, found Bannon and told Smith where he was. Breheney also spoke to Fox about the checks. Although Breheney later decided to discontinue working with Smith, Breheney told Vega that he and Smith's associates were going to "grab" Fox, apparently to attack him in order to convince him to pay them. At the planned meeting, Lamberti was to "smack [Fox], wave a gun in his face, scare him." Before the meeting could took place, however, Breheney was arrested.

## II.

Pascarella's contentions relate to problems of conflict of interest involving his attorneys and his decision to represent himself at trial.

A. The facts relating to these issues are as follows:

During the investigation of this case, attorney Susan Shatanoff represented Pascarella. At his arraignment hearing on April 5, 1995, however, Felix Gilroy represented him. At that hearing, the prosecutor pointed out a potential conflict of interest because Gilroy had represented D'Andrea in the investigative phase of the case.

The magistrate judge then explained at length to Pascarella the potential dangers of two defendants sharing counsel, told him that

he had the right to a separate lawyer (if necessary, court appointed) who would have no conflict, and "strongly recommend[ed]" that "you have a lawyer in this case who has never had anything to do with anybody else in this case." Pascarella stated that he understood the problem, but decided to "just go ahead and keep Mr. Gilroy."

A few days later the prosecution wrote to the district court stating that at the arraignment hearing the magistrate judge "expressed concern that the *Curcio* inquiry was not sufficiently broad, and asked that Your Honor be made aware so that a renewed *Curcio* inquiry could be undertaken."

At the initial case conference on April 14, 1995, a different attorney, Eugene Lamb, represented Pascarella. The judge did not pursue the conflict question.

The trial began on Monday, October 31, 1995. On the Thursday before that date, Pascarella sought to substitute attorney Christine Yaris for Lamb and postpone the trial for a week to give Yaris time to prepare. The district court denied that motion.

On the opening day of the trial, October 31, 1995, the court received a letter from Pascarella detailing his dissatisfaction with Lamb and "request[ing] permission from you to change my lawyer." Pascarella asked that he be allowed to substitute Yaris to represent him at trial, after a one week adjournment to prepare. The letter further stated that months before, Gilroy had arranged for Lamb to represent him "in name only" and that Gilroy had actually continued the representation and continued to receive fees from Pascarella.

At the opening of court on October 31, 1995, Lamb requested permission to withdraw from the case. Lamb explained:

Mr. Pascarella has expressed his dissatisfaction with me as his attorney, actually, beginning back in early September, when I advised Mr. Pascarella that I thought he should dispose of this case short of going to trial.

Mr. Pascarella at that point indicated that he was going to seek other counsel. However, after not speaking with Mr. Pas-

carella for sometime, he did come back to me. However, events of last week have made this situation absolutely untenable.

As a matter of fact, Mr. Pascarella came into my office last Thursday afternoon, demanding his entire file, indicating that he had already retained another attorney.

I turned the entire file over to him. As the Court knows, another attorney did appear at a status hearing before Your Honor on Thursday afternoon, but requested an adjournment before trial at which—which was denied by Your Honor, and she withdrew.

However, Mr. Pascarella has continued to indicate to me his absolute dissatisfaction with my representation, his fear that I am not going to adequately and properly represent him.

As a matter of fact, attempts to have discussions with him regarding the case over the weekend were for naught. As a matter of fact, I wasn't even—didn't even have the discovery material that I had turned over to him returned to me so that I could review it over the weekend.

As I stand here before Your Honor, I don't even have a copy of the indictment in this case.

The following colloquy then took place between the court and Pascarella:

THE COURT: .... [I]t's rather late in the day to decide that you want another lawyer, particularly since I am now hearing that you have had these feelings since early in September.

The answer is, Mr. Pascarella, that you can continue with Mr. Lamb or you can continue on your own and represent yourself.

But there will not be an adjournment of this trial this morning, on the morning when the jury is to be selected, after this matter has been in this courtroom now for some months. We are going to proceed to trial this morning as scheduled, and I don't believe that there is anything further that you can add, Mr. Pascarella, to what I have seen in a letter or a note that you have submitted to me this morning, indicating what Mr. Lamb has just told me,

your dissatisfaction with your lawyer. It comes rather late in the day and we are going to proceed to jury selection.

MR. PASCARELLA: Your Honor, if I may speak I would like to—I would not like Mr. Lamb to represent me in this case.

THE COURT: You can represent yourself.

MR. PASCARELLA: I would rather sir.

THE COURT: If that's your wish, you may do that.

MR. PASCARELLA: That is my wish.

THE COURT: I would suggest that you may want Mr. Lamb to stand by you or have some other lawyer stand by you for purposes of giving you such advice as you may need.

MR. PASCARELLA: Sir, I absolutely refuse to have Mr. Lamb, if you don't mind, sir, not to stand by me.

THE COURT: I don't have any problem with that, Mr. Pascarella. You are entitled to be represented by a lawyer of your choice.

MR. PASCARELLA: Thank you.

THE COURT: You have a constitutional right to represent yourself if that is what you wish.

MR. PASCARELLA: Thank you, sir.

THE COURT: If that is what you want, I can't deny you that right. By all means, I will be happy to give it to you.

If you'd like to have Ms. Yaris or somebody else sit by you for the purpose of advising you, you are free to communicate with her and have her do that.

Mr. Lamb, you are relieved.

In subsequently denying a motion for a new trial, the court stated:

The point that I made before was my sense that Mr. Pascarella, he was unhappy with Mr. Lamb for a long time, he was obviously not being advised by Mr. Gilroy even though he is making checks payable to Mr. Gilroy, he was dealing with Mr. Lamb with whom he was completely dissatisfied and had been dissatisfied for a long time. He could have and had the ability to, and had the intelligence to discharge Mr. Lamb months before this trial got underway, and had chosen another

lawyer of his choice. He waited for four days before the trial.

Pascarella represented himself at trial.

■ B. Pascarella contends that at the arraignment the magistrate judge did not follow the proper procedures in permitting lawyer Gilroy to represent him despite Gilroy's prior representation of the co-defendant D'Andrea.

In *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), this court set forth procedures for district courts to follow in order to protect defendants' rights when they are being represented by counsel with a potential conflict of interest. *Id.* at 888–91. We recently summarized these procedures as follows:

> *Curcio* requires the district court to (i) advise the defendant of the dangers arising from the particular conflict and ascertain that he or she understands the risks involved, (ii) encourage the defendant to seek advice from independent counsel and provide time to digest and contemplate the risks, and (iii) secure a knowing waiver of the right to conflict-free counsel before proceeding.

*United States v. Malpiedi*, 62 F.3d 465, 468 n. 2 (2d Cir.1995).

In the present case the magistrate judge complied with the first and third of these procedures. With respect to the second procedure, however, the magistrate judge merely advised Pascarella: "Well, maybe this is something you ought to think about, very honestly, because it's very important . . . I think you ought to think about it, if you're not sure about it, because it's something—." Pascarella then stated: "I believe, at this point, I can keep Mr. Gilroy. I believe that I can let him represent me at this point."

Although it is doubtful that these statements by the court satisfied the second *Curcio* requirement, we find it unnecessary to determine whether Pascarella made an informed decision when he decided to have Gilroy continue to represent him. Less that ten days later, at Pascarella's next court appearance, a different lawyer, Lamb, appeared for him. At that time there was no indication or even suggestion, that Lamb himself had a conflict of interest, as Pascarella now contends, because although ostensibly independent he in fact was under the control of Gilroy, who then represented D'Andrea. The obligation to undertake a *Curcio* inquiry does not arise unless "a district court is sufficiently apprised of even the possibility of a conflict of interest." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994). The replacement of Gilroy by Lamb as Pascarella's lawyer mooted any question regarding the propriety of Gilroy's representation of Pascarella.

■ Pascarella also contends that Gilroy controlled Lamb's representation of him, and that Lamb thus was subject to a conflict of interest, of which Pascarella was unaware, which vitiated Lamb's representation of him and denied him effective assistance of counsel. Pascarella first brought this contention to the district court's attention in the letter the district court received on the morning on the first day of trial, in which Pascarella also requested permission to change his lawyer. At the beginning of that court session the court informed Pascarella that if he did not wish Lamb to represent him, he had the right to terminate Lamb's services, but if he did so he would have to represent himself. When Pascarella stated that that course was agreeable, the court relieved Lamb as Pascarella's lawyer.

Here, as in the case of Gilroy's possible conflict of interest because he had represented D'Andrea, which was raised at the arraignment, the termination of Lamb's representation of Pascarella before the trial began obviated any need for the court to conduct a *Curcio* inquiry to determine whether Lamb had a conflict of interest during his prior representation of Pascarella. Any conflict of interest that undermined Lamb's ability properly to represent Pascarella disappeared once Lamb no longer represented him. Pascarella makes no attempt to show how such a conflict before the trial began, even if it existed, prejudiced Pascarella in the presentation of his defense.

■ C. Pascarella next contends that the district court improperly permitted him to represent himself at trial because the court failed to (1) explain to him the dangers and

problems involved in self-representation and (2) ascertain that Pascarella was qualified to represent himself. He relies upon the statement in the plurality opinion in *von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), that for a waiver of a criminal defendant's right to be represented by counsel to be valid, "such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Id.* at 724, 68 S.Ct. at 323–24. He asserts that here the district court failed to make the "penetrating and comprehensive examination of all the circumstances" surrounding "an accused's professed waiver of counsel" that *von Moltke* requires. *Id.*

That case, however, as well as most of the other cases upon which Pascarella relies, involved situations in which the defendant waived the right to counsel because he preferred to represent himself rather than to have a lawyer represent him. The present case involves a quite different situation. Pascarella wanted to be represented by a lawyer, but waived that right because (1) he did not want the lawyer who had represented him to continue to do so at trial and (2) the district court had denied his belated request for a postponement of time to enable the lawyer he wanted to prepare for trial.

Pascarella's problem and dilemma were the result of his own doing. As the district court pointed out, Pascarella had had "these feelings [of dissatisfaction with Lamb] since early in September." Pascarella waited until October 27 to seek a postponement of the trial to permit a proposed new lawyer to prepare, and waited until the first day of trial, October 31, to tell the district court that he did not want Lamb to represent him at trial.

Although the district court should strive for a "full and calm" discussion with the defendant to assure that he fully understands his decision, we have declined to mandate any particular "talismanic" procedures to this end. . . . In short, the record

must establish that a defendant knew "what he [was] doing and his choice [was] made with eyes open."

*United States v. Hurtado*, 47 F.3d 577, 583 (2d Cir.) (quoting *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), *cert. denied*, —— U.S. ——, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995)).

In denying Pascarella's motion for a new trial on this ground, the district court stated:

My view of what transpired . . . was that it was a very carefully calculated attempt to put Mr. Pascarella precisely where he is today. My view of it was that Mr. Pascarella understood exactly what it meant to proceed pro se and his decision to do so was a knowing and voluntarily [sic] one. . . .

There is no reason to reject this conclusion of the trial judge. Although Pascarella had to make the difficult choice whether to continue with Lamb or to represent himself, the particular unusual facts of this case satisfy us that the district court correctly concluded that Pascarella fully understood what he was doing and its consequences when he elected to represent himself rather than continue with Lamb. In these circumstances, his waiver of his right to counsel was valid because it was made with full awareness of the consequences of his actions.

■ D. Finally, Pascarella challenges the district court's refusal to grant a week's postponement of trial, first requested four days before the trial began, to enable his newly selected lawyer to prepare for trial.

■ "The disposition of a request for continuance rests in the discretion of the trial judge and the exercise of that discretion will not be disturbed unless a clear abuse is shown." *United States v. Bentvena*, 319 F.2d 916, 934–35 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). "[W]e review the district court's decision not to grant a continuance for time to prepare for an abuse of discretion. The sole requirement of such a denial is that it be reasonable under the circumstances." *Hurtado*, 47 F.3d at 584 (citation omitted).

In light of the circumstances previously discussed, we cannot say the district court abused its discretion in denying Pascarella's belated request for a continuance. What we said in *United States v. Rosenthal,* 470 F.2d 837 (2d Cir.1972), *cert. denied,* 412 U.S. 909, 93 S.Ct. 2298, 36 L.Ed.2d 975 (1973), where we upheld denial of a continuance in similar circumstances, is equally applicable here:

> In light of Rosenthal's long association with his counsel, his asserted discovery that his counsel was unprepared and inexperienced in criminal matters just four days before trial merits no consideration....
>
> > We and other courts of appeals have repeatedly made clear that the right to counsel "cannot be ... manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." [citation omitted] Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay.

*Id.* at 844 (quoting *United States v. Llanes,* 374 F.2d 712, 717 (2d Cir.), *cert. denied,* 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 (1967)).

### III.

A. D'Andrea, the only appellant who took the stand, testified that he did not know that the refund checks he deposited in his personal bank account were stolen; he contended that in depositing the checks he had been duped by his business partner, Bartiromo, who gave him the checks. To counter this testimony, the government introduced evidence that two checks totaling approximately $43,000 that had been stolen in 1992, had been deposited in D'Andrea's same bank account. The court gave a limiting instruction to the jury, pointing out that the only purpose for which this evidence could be used was to establish D'Andrea's knowledge that the rebate checks were stolen.

■ The district court properly admitted the evidence for that limited purpose under Fed.R.Evid. 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

*Id.* This court follows the "inclusionary" approach to "other crimes, wrongs, or acts" evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, *see United States v. Harris,* 733 F.2d 994, 1006 (2d Cir.1984), or unless it is overly prejudicial under Fed.R.Evid. 403 or not relevant under Fed.R.Evid. 402. *See United States v. Sappe,* 898 F.2d 878, 880 (2d Cir. 1990). "The trial court's decision to admit such evidence will be reversed only for a clear abuse of discretion." *Id.*

■ The critical issue at trial with respect to D'Andrea's guilt was whether he knew the checks were stolen. The evidence that other stolen checks had been recently deposited in the same bank account was highly relevant to that question. "Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." *United States v. Zackson,* 12 F.3d 1178, 1182 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994); *see also United States v. Mickens,* 926 F.2d 1323, 1329 (2d Cir.1991) (affirming admission of evidence of prior narcotics activity because it was "relevant to the second element of the money laundering charge, *i.e.,* that [the defendant] knew that the laundered funds derived from an unlawful source"), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); *United States v. Ramirez,* 894 F.2d 565, 568–69 (2d Cir.1990) (affirming admission of evidence of a different narcotics transaction to rebut defendant's claim that he did not know the contents of a package of contraband). Furthermore, D'Andrea has not shown that the prejudicial effect of the evidence outweighed its probative value under Fed.R.Evid. 403. The district court did

not abuse its discretion in admitting this evidence.

■■■ B. D'Andrea complains that the district court improperly excluded certain evidence by which he sought to show that Bartiromo had duped him with respect to the deposit in his account of the stolen Ford refund checks. "[J]udges are accorded 'wide latitude' in excluding evidence that poses an undue risk of 'harassment, prejudice [or] confusion of issues' or evidence that is 'repetitive or only marginally relevant.'" *United States v. Blum,* 62 F.3d 63, 67 (2d Cir.1995) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)). They may place "reasonable restrictions on the admission of evidence based on the concerns as to 'prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir.1995) (quoting *Delaware,* 475 U.S. at 679, 106 S.Ct. at 1435).

The district court permitted D'Andrea to present considerable evidence concerning his claim that Bartiromo had duped him. The evidence the court excluded was either repetitive, inadmissible hearsay, confusing, or of only marginal relevance. Much of it related to the earlier deposit of stolen checks in D'Andrea's bank account, and its admission could have led to a "trial within a trial" on whether Bartiromo had duped D'Andrea and others in the past by depositing checks in their accounts without their knowledge. *See United States v. Aboumoussallem,* 726 F.2d 906, 912 (2d Cir.1984).

■■■ C. D'Andrea contends that the district court erroneously gave, at the government's request, a "conscious avoidance of knowledge" charge, and that the charge given was improper.

■■■ 1. A conscious avoidance charge is appropriate where "(a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt 'that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *United States v. Hopkins,* 53 F.3d 533, 542 (2d Cir.1995) (quoting *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)), *cert. denied,* —— U.S. ——, 116 S.Ct. 773, 133 L.Ed.2d 725 (1996). D'Andrea's participation in the check-cashing transaction, his intentional avoidance of currency transaction reporting through restructuring the transaction, the immediate withdrawal of a substantial portion of the funds, and the prior act evidence could have led the jury to believe that D'Andrea (at the very least) "consciously avoided" learning that the checks were stolen. *See United States v. Baker,* 926 F.2d 179, 181 (2d Cir.1991) (per curiam) (conscious avoidance charge proper under circumstances similar to D'Andrea's). Furthermore, contrary to D'Andrea's allegation, the conscious avoidance portion of the charge was identified as referring only to the substantive offense and not to the conspiracy count.

2. The district court gave the following charge:

> The defendant's knowledge may be proved by evidence that he was aware of a high probability that the checks were stolen or fraudulently obtained, despite that high probability, the facts show that the defendant actually believed that the checks were not stolen or fraudulently obtained.
>
> . . . .
>
> So, if you find that the defendant acted with the deliberate disregard of whether the checks were stolen or fraudulently obtained, and with a conscious purpose to avoid learning the truth, the requirement of knowledge would be satisfied unless, despite that deliberate ignorance, you find the defendant actually believed that the checks were not stolen.

Although D'Andrea objected to the giving of a conscious avoidance charge, he did not object to any of the foregoing language. He now contends, however, that the charge constituted plain error because, in the fourth line of the first paragraph, the word "unless" should have been included before the word "despite."

The second paragraph does contain the word "unless" in the same place, and the conscious avoidance charge as a whole informed the jury that even if the defendant

was aware of the high probability that the checks were stolen, he could not be convicted if he actually believed that they had not been stolen. This was a correct statement of the law. *See United States v. Khan*, 53 F.3d 507, 516–17 (2d Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996).

■ D. Finally, D'Andrea argues that the district court erred in not dismissing the substantive bank fraud count (count six) because there was insufficient evidence to show that the bank in which D'Andrea deposited the stolen checks was federally insured.

An FBI agent who had investigated the case testified that the bank was "insured by the FDIC." D'Andrea did not object to that evidence, did not cross-examine the witness about it, and did not offer any contrary evidence of his own. Moreover, D'Andrea's bank statements stated that the bank was so insured. The agent's failure to state explicitly that the bank was insured on the day on which D'Andrea deposited the stolen Ford checks does not vitiate the probative value of the evidence. The government may rely on "oral testimony that the bank is insured, [where] the interval between the crime and the trial is not too great, [and] it is reasonable to conclude that 'viewed in context, the jury could draw the inference that the bank was insured at the time [of the fraud].'" *United States v. Schermerhorn*, 906 F.2d 66, 70 (2d Cir.1990) (quoting *United States v. Sliker*, 751 F.2d 477, 484–85 (2d Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985)).

IV.

A. The conspiracy count of the indictment (count one) charged the defendants with conspiring (a) to transport stolen property interstate, (b) to defraud financial institutions and

(c) to use violence and express and implicit threats of violence to persons to collect and attempt to collect extensions of credit, as that term is defined in 18 U.S.C. § 891(1), and to punish persons for the nonrepayment of extensions of credit, in violation of Title 18, United States Code, Section 894(a).

■ Breheney contends that the government failed to prove this third aim of the conspiracy because the evidence did not show any "extension of credit," as defined in 18 U.S.C. § 891(1) (1988). He contends that the failure of proof vitiated his conspiracy conviction. We conclude, however, that even if the evidence was insufficient to prove the extension of credit aim, the conspiracy conviction was valid. Accordingly, without determining whether the government proved the extension of credit aim, we affirm the conspiracy conviction.

In *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the defendant was convicted under an indictment charging her with conspiring to defraud two government agencies. The evidence was sufficient to show one of the objectives, but insufficient to convict her of the other. The jury returned a general verdict. *See id.* at 47–48, 112 S.Ct. at 468–69.

The Supreme Court upheld the conspiracy conviction, holding that the lack of sufficient evidence to support one of the objects of a multi-object conspiracy did not vitiate the conspiracy conviction, where there was sufficient evidence to support the other object. *Id.* at 60, 112 S.Ct. at 474–75. The Court applied what it called the "prevailing rule" set forth in *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970): "'[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" *Griffin*, 502 U.S. at 56–57, 112 S.Ct. at 472–73.

In the present case, Breheney does not challenge the sufficiency of the evidence to support his conviction for the substantive offense of interstate transportation of stolen property and for the two other aims of the conspiracy (such transportation and bank fraud). Thus, under *Griffin*, we may affirm the conspiracy conviction because of the sufficiency of the evidence as to the unchallenged aims of the conspiracy.

B. On the day of Breheney's arrest, government agents searched his home pursuant to a search warrant that authorized a search

for material relating to Breheney's gambling activities but did not refer to his involvement in the stolen check scheme. During the search, the agents found and seized certain evidence implicating him in the stolen check scheme, including a note pad containing the phone numbers of several co-conspirators, in addition to evidence relating to his gambling activities.

Prior to trial Breheney moved to suppress the seized evidence, on the ground that it resulted from of an unlawful search and seizure because the search was "pretextual" in that, although the warrant dealt with evidence of gambling, the government's real motive was to discover evidence relating to the stolen check scheme.

The district court denied the motion to suppress on the basis of *United States v. Scopo*, 19 F.3d 777 (2d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994). In *Scopo* the police stopped an automobile for a minor traffic violation and, on searching the car, discovered a loaded pistol. *Id.* at 780. Scopo was indicted for a federal firearms violation. *Id.* The district court suppressed the firearm, because "(1) the stop of Scopo's car, through the pretext of a minor traffic violation, was unjustified because there was no reasonable suspicion that he was engaging in criminal activity; (2) Scopo's arrest was a pretext to search his car for weapons; and (3) therefore the stop and arrest of Scopo violated the fourth amendment." *Id.* at 778–79.

This court reversed. *Id.* at 785. The court stated that the police officers "acted within their authority in stopping Scopo for violation of the state [traffic] law," even though that violation was "minor," *id.* at 781, and that "once the police had probable cause to stop and arrest Scopo, they were entitled to search both him and his 'grab space' in the car, especially since one officer had observed him throw an object down in the car." *Id.* at 782.

In so deciding, the court adopted the "authorization" test that several circuits had applied, namely, that "where the arresting officer had probable cause to believe that a traffic violation occurred or was occurring in the officer's presence, and was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment." *Id.* at 784. The court stated that "[t]he 'authorization' approach is also in keeping with this Court's pretextual arrest doctrine." *Id.* It cited as illustrative of the latter this court's statement in *United States v. Nersesian*, 824 F.2d 1294 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987) that as long as "a valid basis for a detention and search . . . exists . . . [it] is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search." *Id.* at 1316. Although the validity of a traffic arrest challenged as a pretext for a search to discover evidence of another offense is currently being considered by the Supreme Court, *see United States v. Whren*, 53 F.3d 371 (D.C.Cir.1995), *cert. granted*, — U.S. —, 116 S.Ct. 690, 133 L.Ed.2d 595 (1996), we continue to adhere to *Scopo* until advised to the contrary.

■ The district court correctly refused to suppress the evidence on the claim that the search was pretextual. The search was conducted pursuant to a warrant, and Breheney neither challenges the probable cause basis upon which the warrant was issued or the way in which the search was conducted. The warrant and search were valid on their face and within the authorization of the officers. Their validity cannot be impeached by the claim that in conducting the search for gambling evidence (some of which the police found), the police hoped to find evidence of another offense they also were investigating.

■ C. At trial, the court permitted the government to introduce evidence of Breheney's past gambling dealings with some of the co-conspirators to enable the government to "establish the basis of a trust relationship between Smith, Lamberti and Breheney." As we observed in *United States v. Rosa*, 11 F.3d 315 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994), "[w]e have held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to

help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Id.* at 334.

The evidence was pertinent to explain why Breheney trusted Vega, a co-conspirator who testified for the government, and why he did not believe an allegation by two other co-conspirators that Vega was a rat. The district court did not abuse its discretion in admitting the evidence.

Contrary to Breheney's contention, for prior bad act evidence to be admissible, the act need not be "sufficiently similar that it approaches near identity with the elements of the offense charged." Similarity of the acts is required only when the evidence is used to prove knowledge, intent, or a common scheme or plan. *See, e.g., United States v. Affjehei,* 869 F.2d 670, 674 (2d Cir.1989) ("[E]vidence of another act should not be admitted to show knowledge unless the other act is 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence.'") (quoting *United States v. Peterson,* 808 F.2d 969, 974 (2d Cir.1987)); *United States v. O'Connor,* 580 F.2d 38, 41–43 (2d Cir.1978) (admission of evidence of past acts at a different location was error because the evidence was not relevant to show common scheme or plan). In contrast, evidence of wholly different acts has been held admissible to show the background of a conspiracy or the development of a relationship of trust between the participants. *See, e.g., Rosa,* 11 F.3d at 333–34 (affirming admission of evidence dealing with two men's past cooperation in auto theft, although case involved only narcotics, racketeering and weapons offenses). That was the situation here.

D. At oral argument Breheney suggested that even if the alleged lack of proof of the extension-of-credit issue did not justify reversing his conviction, it would warrant a remand for resentencing because his sentence reflected his conviction on the charge. Breheney did not raise the issue in his lengthy brief, however, but made the point for the first time at oral argument. We decline to consider this belated argument.

*United States v. Clements,* 992 F.2d 417, 420, n. 4 (2d Cir.) (per curiam) *cert. denied,* —— U.S. ——, 114 S.Ct. 316, 126 L.Ed.2d 262 (1993); *United States v. Kessler,* 449 F.2d 1315, 1317 (2d Cir.1971).

## CONCLUSION

The appellants' convictions are affirmed.