UNITED STATES of America,
Appellee,

v.

Ehab CORIATY, Defendant–Appellant.

Docket No. 01–1450.

United States Court of Appeals,
Second Circuit.

Argued: May 1, 2002.

Decided: June 21, 2002.

Michael Salnick, West Palm Beach, FL, for Defendant–Appellant.

Jay K. Musoff, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York; Baruch Weiss, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Before MINER and SACK, Circuit Judges, and BERMAN, District Judge.*

SACK, Circuit Judge:

The defendant, Ehab Coriaty, appeals from a judgment upon his conviction by a jury of one count of conspiracy, 18 U.S.C. § 371, and eight counts of wire fraud, 18 U.S.C. §§ 1343, 1346 & 2. The United States District Court for the Southern District of New York (Nicholas Tsoucalas, *Judge*[1]) sentenced him principally to forty-four months' imprisonment and three years' supervised release, and ordered restitution in the amount of $844,098.35. Coriaty asserts that six aspects of the district court's judgment were erroneous: (1) its failure to dismiss Coriaty's conviction for conspiracy to commit wire fraud; (2) its determination of the loss amount for sentencing purposes; (3) its finding of a restitution amount allegedly in excess of the actual loss suffered by the victim; (4) its sentencing enhancement for Coriaty's more than minimal planning role; (5) its denial of a motion for a downward departure for extraordinary family circumstances; and (6) its failure to find that allegedly inflammatory comments by the prosecutor during the course of his summation denied Coriaty a fair trial. We conclude that none of the alleged errors warrants disturbing the district court's judgment and therefore affirm part of the judgment and dismiss the appeal with respect to the remainder of Coriaty's claims.

## BACKGROUND

*Facts*

Coriaty was convicted of a complex scheme to defraud his employer, Nicole Durr, of funds she invested through Advest, a securities brokerage firm and bank. We set forth only the facts relevant to this appeal.

On October 28, 1997, Durr invested $1 million in an Advest account. Coriaty, as vice-president and chief executive officer of Durr's company, Dur Music, possessed the authority to wire money from this account "to cover operational expenses and to pay employee salaries." Presentence Investigation Report ("PSR") at 8. On February 19, 1998, Durr withdrew $100,000 from the

---

* The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

1. Of the United States Court of International Trade, sitting by designation in the district court.

Advest account. Apparently as a partial result of trading on the account, $914,098.35,[2] rather than $900,000 (the net result of the $1 million Durr placed in the Advest account less the $100,000 she withdrew), remained in the account at the beginning of the following month, March 1998. At about the same time, Durr also authorized Coriaty to manage the investment of an additional $700,000 of her money. These funds were eventually placed in an account at a firm now known as FFP Securities. Coriaty had discretion with respect to the management of the investment of funds in the FFP account, but Durr hired a professional financial consultant named Donald Warner to invest the funds in the Advest account.

On March 3, 1998, without Durr's knowledge or consent, Coriaty instructed Warner to liquidate the Advest account and to transfer the resulting $914,098.35 to Durr's FFP account. The transfer was completed by May 28, 1998. Meanwhile, between March 16 and April 23, 1998, Coriaty transferred a total of $706,000 from the FFP account to a third account held at Wall Street Discount Brokers under the name of Roman Capital, a company jointly owned by Coriaty and one Howard Rosen, Coriaty's co-conspirator.

Of the $706,000 transferred to the Roman Capital account, Coriaty sent $229,000 to accounts of his own; Rosen moved $219,000 into Rosen's own accounts. The remaining $258,000 in the Roman Capital

account was lost through what the government terms "wildly unsuccessful" stock market investments. Appellee's Br. at 9. In June and September 1998, Coriaty returned a total of $70,000 to Durr from his personal funds, apparently as part of his attempt to hide the other transactions from Durr.

Of the $914,098.35 transferred from the Advest account, approximately $208,000 remained in the FFP account mingled with the $700,000 that Durr had originally entrusted to Coriaty in the FFP account. While the fraud was being perpetrated, the Coriaty-managed FFP account suffered a loss of more than $250,000[3] as a consequence of further "wildly unsuccessful" securities trading. During the course of the fraud, Coriaty was managing trading on the funds in the FFP account. Trades on this account during the perpetration of the fraud resulted in losses of more than $250,000. In other words, the amount lost from the FFP account due to trading exceeded the $208,000 that remained in the FFP account from the funds improperly transferred from the Advest account after accounting for the transfers to the Roman Capital account. At the fraud's conclusion, therefore, Durr had nothing in her Advest account and, in her FFP account, an amount that was significantly less than the $700,000 that she had initially placed there.[4]

Coriaty was indicted on, *inter alia*, a charge of conspiracy to commit securities

2. Some of the dollar amounts referred to in this opinion are precise to the penny; some less so. The conclusions we draw do not depend, however, on the precision of the numbers.

3. The record does not disclose precisely how much money was lost through securities trading in the FFP account during the course of the fraud. The government asserts, however, that the amount was "over $250,000." Appellee's Br. at 36, n.*. Coriaty concedes

that money was lost and does not contest the government's calculation. We therefore accept the "over $250,000" figure for purposes of our analysis.

4. Adding the $208,000 remaining from the transfer from Advest to the $700,000 deposited by Durr into the FFP account, and subtracting the $250,000 in trading losses, produces $658,000 in the FFP account at the end of the defendant's fraud.

fraud and wire fraud. As the objects of the conspiracy, the government alleged both violations of the securities laws and wire fraud. Among the overt acts charged was the transfer of the $914,098.35 from the Advest account to the FFP account effectively controlled by Coriaty.[5] The indictment also included one securities fraud count and sixteen counts of wire fraud.

### Proceedings in the District Court

After a trial that began on March 12, 2001 and concluded on March 21, 2001, a jury convicted Coriaty on the conspiracy charge, the securities fraud charge, and eight counts of wire fraud involving the transfers from the Roman Capital account to his personal accounts. On a special verdict form, the jury found Coriaty guilty of both of the conspiracy's objects: securities fraud and wire fraud.

In July 2001, Coriaty made a motion for a new trial pursuant to Fed.R.Crim.P. 33, which the district court construed as a motion for post-verdict acquittal pursuant to Fed.R.Crim.P. 29(c). The court thereupon dismissed the securities fraud conviction because of the absence of evidence of any misrepresentation involving the nature or value of a security. *United States v. Coriaty*, 2001 WL 1910843, at 8 (S.D.N.Y. July 16, 2001). The district court nevertheless found "sufficient evidence to sustain the charge of conspiracy to commit wire fraud." *Id.* at *6 n. 2.

On August 20, 2001, the district court sentenced Coriaty to forty-four months' imprisonment, three years' supervised release, a fine of $7,500, and a special mandatory assessment of $900. The court also ordered the defendant to pay $844,098.35 in restitution. This appeal followed.

## DISCUSSION

### I. Standards of Review

■ We review questions of law *de novo. United States v. Grant*, 235 F.3d 95, 99 (2d Cir.2000). On sentencing issues, we "accept the findings of fact of the district court unless they are clearly erroneous, and will not overturn the court's application of the [United States Sentencing] Guidelines to the facts before it unless we conclude that there has been an abuse of discretion." *United States v. Deming*, 269 F.3d 107, 109 (2d Cir.2001) (per curiam) (internal citation and punctuation marks omitted); *see also* 18 U.S.C. § 3742(e) (permitting appellate courts to vacate a sentencing finding that is, *inter alia,* "in violation of law[,] ... imposed as a result of an incorrect application of the sentencing guidelines[, or] outside the applicable guideline range, and ... unreasonable"). A district court's factual findings on loss are similarly reviewed for clear error and its legal conclusions *de novo. United States v. Carboni*, 204 F.3d 39, 46 (2d Cir.2000). Finally, "[a] sentencing court's order of restitution is reviewed for abuse of discretion." *United States v. Berardini*, 112 F.3d 606, 609 (2d Cir.1997).

### II. The Conspiracy Charge

■ Coriaty first argues that the district court erred in failing to dismiss his conspiracy conviction after it vacated his securities fraud conviction for insufficient evidence. *Coriaty*, 2001 WL 1910843 at *1. Coriaty was indicted for conspiracy "to commit wire fraud *and* securities fraud," but was convicted only of conspiracy to commit wire fraud. While the indictment used the conjunctive, the jury charge described the "conspiracy" as one "to commit

---

**5.** The indictment refers to Advest as "DSW Investments." Coriaty does not suggest that this is an error, but neither he nor the government offers an explanation for the variance between the indictment and the briefs.

wire fraud *or* securities fraud." Coriaty contends that either the indictment was constructively amended or he was convicted of a crime not alleged in the indictment in violation of the Fifth Amendment. We disagree.

To be sure, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Nevertheless, "the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime" provided that "each offense whose elements are fully set out in an indictment can independently sustain a conviction." *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). Hence, "the lack of sufficient evidence to support one of the objects of a multi-object conspiracy [does] not vitiate the conspiracy conviction, where there was sufficient evidence to support the other object." *United States v. Pascarella*, 84 F.3d 61, 71 (2d Cir.1996); *see also Griffin v. United States*, 502 U.S. 46, 47–48, 60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (affirming a conviction under circumstances similar to those of the case at bar); *Miller*, 471 U.S. at 136, 105 S.Ct. 1811 (noting that "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored") (internal quotation marks omitted).

We have upheld convictions for multi-object conspiracies charged in the conjunctive even when there was insufficient evidence to support one of the objects of the conspiracy. "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); *see also United States v. Berger*, 224 F.3d 107, 113 (2d Cir.2000) ("[A]s a matter of law ... the government needed only to prove agreement on one of the objectives charged in the indictment in order to establish that a conspiracy existed."). "The rule that a jury's guilty verdict on a conjunctively worded indictment stands if the evidence is sufficient with respect to any of the acts charged, 'obviously extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment.' " *United States v. Rioux*, 97 F.3d 648, 661 (2d Cir.1996) (quoting *United States v. Cusumano*, 943 F.2d 305, 311 (3d Cir.1991)).

Coriaty does not contend that the first count of the indictment did not include a charge of conspiracy to commit wire fraud, or that he lacked notice that he was being prosecuted for this crime. His argument is therefore without merit. *See United States v. Delano*, 55 F.3d 720, 729–30 (2d Cir.1995) (noting that where a defendant is "given notice of the core of criminality to be proven at trial," a "variance" is not reversible error) (internal punctuation omitted). Only where "there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment" is dismissal warranted. *Id.* at 729 (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988)). The wire fraud conspiracy was not "other than" the conspiracy charged in Coriaty's indictment, but was a component thereof. Coriaty thus "was tried on an indictment that clearly set out the offense for which he was ultimately convicted." *Miller*, 471 U.S. at 140, 105 S.Ct. 1811.

### III. The Loss Calculation

 Coriaty next contends that the district court erred in calculating loss for sentencing purposes by including funds that were never transferred out of Durr's FFP account.

According to the commentary for United States Sentencing Guideline ("U.S.S.G.") § 2F1.1, under which Coriaty was sentenced, "loss is the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, cmt. n. 8.[6] A district court need not establish loss "with precision [but] need only make a reasonable estimate of the loss, given the available information." *Id.* § 2F1.1, cmt. n. 9; *accord Carboni*, 204 F.3d at 46. "It is also accepted that loss may consist of probable or intended loss." *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.1997). "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, cmt. n. 8.

 Ample evidence supported the district court's finding that Coriaty intended to deprive Durr of $914,098.35. A defendant "is presumed to intend the natural and 'probable' consequences of [his or her] acts." *Jacobs*, 117 F.3d at 95. Coriaty repeatedly attempted to obtain control over the $914,098.35 in Durr's Advest account through requests to manage the entire amount before the fraud occurred; he also systematically deceived her about the status and location of that amount after the perpetration of the fraud. Evidence of those efforts warrants the district court's conclusion that Coriaty intended to misappropriate the entire amount in the Advest account.

 It is well established, moreover, that "loss in fraud cases includes the amount of property taken, even if all or part has been returned." *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997) (collecting cases). Here, Coriaty removed from Durr's agent, and assumed improper control over, the entire $914,098.35. The district court, basing its decision on the PSR, correctly "calculated the loss on the basis of the funds placed under the defendant's control." *Jacobs*, 117 F.3d at 95; *see also Carboni*, 204 F.3d at 47 (noting that a loss amount includes loss from all acts and omissions comprising the same course of conduct).

The district court's conclusion that Coriaty intended to defraud Durr of the entire $914,098.35 was thus correct and, perforce, not clearly erroneous.

### IV. The Restitution Calculation

Coriaty next challenges the district court's calculation of the restitution amount. The amount of the restitution order should be reduced, he argues, to the amount that he transferred from the Roman Capital account to his own account: $229,050. In the alternative, he asserts that it should be limited to the $706,000 in fact transferred from Durr's accounts into the Roman Capital account, less the $70,000 returned to Durr: $636,000. The district court took a different view, calculating the restitution amount by beginning with the amount moved from the Advest account to the FFP account, $914,098.35, and subtracting from it only the amount Coriaty returned to Durr, yielding a net restitution amount of $844,098.35.

Coriaty's argument rests in part on the fact that approximately $208,000 of the

---

**6.** All citations to the United States Sentencing Guidelines manual refer to the edition effective November 1, 2000.

money transferred from the Advest account to the FFP account was not moved to the Roman Capital account and therefore never left Durr's control. This money, he reasons, was never a "loss" for Durr. His argument also implicitly rests on the premise that it is impossible to determine how to allocate the loss that occurred in the FFP account resulting from trading activity under the defendant's management. For this reason, the loss cannot be conclusively traced to either the funds originating in the Advest account or those initially placed in the FFP account. *Cf. United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2d Cir.1986) (noting that "the credit balance of an account is the cumulative result of all transactions affecting the account," not "a specific *res*" that can be identified and disaggregated).

▅▅▅▅ In the district court, however, Coriaty objected only to the loss calculation, and made no mention of restitution. Raising the loss amount did not properly present the restitution issue to the district court. Whether an error is adequately raised at trial is considered under Fed. R.Crim.P. 30. *United States v. Vasquez*, 267 F.3d 79, 86–87 (2d Cir.2001), *cert. denied*, 534 U.S. 1148, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002). Rule 30 requires that both "the matter to which the party objects and th[e] ground of the objection" be aired. Fed.R.Crim.P. 30. Here, as Coriaty's counsel candidly conceded in a post-argument letter invited by the Court, Coriaty made no mention in the district court of "the matter to which [he now] objects," the restitution amount. *Id.* The alleged error in restitution was thus not properly raised. A sentencing issue "not raised in the district court … will be deemed forfeited on appeal and addressed only upon a showing that the court committed plain error." *United States v. Miller*, 263 F.3d 1, 4 (2d Cir.2001). For plain error there

must be (1) an "error," (2) that is "plain," (3) that "affect[s] substantial rights," and that (4) "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal citation and quotation marks omitted; alterations in original).

▅▅▅▅ We conclude that the district court was correct and that there was therefore no error here, plain or otherwise. "[T]he Victim and Witness Protection Act of 1982 … governs a sentencing court's authority to determine and impose a restitution penalty on a criminal defendant." *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir.1994) (citing 18 U.S.C. §§ 3663–64). For a fraud offense under Title 18, such as the one for which Coriaty was convicted, 18 U.S.C. § 3663A governs restitution. 18 U.S.C. § 3663A(c)(1)(A)(ii). According to § 3663A, where property taken from a victim cannot be returned, a defendant must "pay [to the victim] an amount equal to … the greater of … the value of the property on the date of damage [or] the value of the property on the date of the sentencing, less … the value … of any part of the property that is returned." *Id.* § 3663A (b)(1)(B). Victims include those "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* § 3663A(a)(2). Unlike loss calculations, "a court's power to order restitution is limited to actual loss." *Carboni*, 204 F.3d at 47.

For three reasons, we conclude that the district court correctly decided that restitution should be $914,098.35 less the

amount actually paid by Coriaty to Durr out of his own funds after the fraud began.

First, "the value of [Durr's] property on the date of the damage" was $914,098.35— the amount fraudulently taken from Durr's Advest account and deposited in the FFP account. *See* 18 U.S.C. § 3663A(b)(1)(B)(I). Coriaty is therefore responsible for the amount taken, $914,098.35, less what he returned, $70,000, irrespective of the fact that $208,000 was lost in securities trading on the FFP account, which contained money knowingly and willingly placed there by Durr.

Second, "restitution may be ordered" to "any person directly harmed by the defendant's criminal conduct in the course of [a] conspiracy." 18 U.S.C. § 3663A(a)(2); *cf. United States v. Bortnovsky*, 879 F.2d 30, 42 (2d Cir.1989) ("[R]estitution may be ordered for any act committed as part of a conspiracy."). The defendant's transfer of funds from the Advest account to the FFP account, according to the indictment, was an overt act "in the course of" the conspiracy. Indictment at ¶ 7. Coriaty is therefore responsible for *all* losses his conspiracy caused, including the funds lost through trading on the FFP account. But for the defendant's unauthorized transfer from the Advest account, the money would have remained there and Durr would not have lost any of it as a consequence of Coriaty's unauthorized and illegal activities.

Finally, we find no significance in the impossibility of determining whether the funds that were lost through trading on the FFP account during the course of the conspiracy originated legitimately in the FFP account or were transferred into that account illegitimately from the Advest account. Coriaty bears sole responsibility for the commingling of funds he legitimately controlled with funds he improperly transferred. Absent evidence to the contrary, he cannot now ascribe trading losses to the former.

Although no court of appeals appears previously to have addressed a factual situation identical to this one, we draw guidance from the treatment of narcotics proceeds in forfeiture actions. Reviewing a 21 U.S.C. § 881 forfeiture action against accounts in which drug proceeds and other funds had been commingled, we have determined that "Congress intended the forfeiture statute to apply to a credit balance reflecting the cumulative results of deposits into and withdrawals from an account into which were deposited proceeds from drug sales." *Banco Cafetero Panama*, 797 F.2d at 1159. While we lack the clear indicia of congressional intent available in *Banco Cafetero Panama*, we conclude that the statutory focus on the victim's loss and upon making victims whole suggests that Coriaty should bear the burden of demonstrating that funds expended from the commingled FFP account were not those fraudulently transferred by him from the Advest account. *See* 18 U.S.C. § 3663A(b)(1)(B). *Banco Cafetero Panama* established that after the government proves that an account contains, albeit commingled, narcotics proceeds, it may apply the "lowest intermediate balance rule," used, *inter alia*, to determine trust beneficiaries' rights in accounts where trust funds and trustee's funds have been commingled. 797 F.2d at 1159–61. Under this rule, "any funds removed from [a general account where funds were commingled] are presumed to be the debtor's personal funds to the extent these funds exceed the beneficiary's equitable interest [in the account]." *Foster v. Kinzler*, 275 F.3d 924, 927 (10th Cir.2001); *accord Banco Cafetero Panama*, 797 F.2d at 1159; *see also Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 289–90 (2d Cir.1992) (Newman, J., concurring in part

and dissenting in part) ("[W]here the difficulty of determining the amount of damages has been created by the wrongdoer's conduct, the law is ... generous and places on a plaintiff only a burden to show that the wrong caused damages that are some undefined part of a larger sum, with the burden on the defendant to prove the portion of the larger sum that is *not* compensable damages.") (emphasis in original). In the absence of evidence to the contrary, the funds that were lost through trading under Coriaty's management of the FFP account must therefore be attributed, to the extent possible, to the analog in this case to his "personal funds": the money improperly acquired from the Advest account. *Cf. Banco Cafetero Panama*, 797 F.2d at 1161 (noting that once the government establishes that an account contains narcotics proceeds, "[t]he burden [is] on the claimant to demonstrate that no portions of the account" are narcotics proceeds). Coriaty failed to produce any such contrary evidence.

Having determined that there was no error, we need not decide whether the remaining parts of the *Olano* plain-error test have been satisfied.

## V. The Sentencing Enhancement for More than Minimal Planning

■ Coriaty argues that he was improperly subjected to a sentencing enhancement for more than minimal planning. He argues that the enhancement was inappropriate because he "did not open or establish new accounts," Appellant's Br. at 22, because his crime was "stupid," *id.*, and because an enhancement based on his multiple wire frauds constitutes "double counting," *id.* at 24.

■ According to the commentary to U.S.S.G. § 1B1.1, "more than minimal planning" includes "more planning than is typical for commission of the offense in a

simple form" and "significant affirmative steps ... to conceal the offense." U.S.S.G. § 1B1.1, cmt. n. 1(f). Under the Sentencing Guidelines' plain language, it is the amount of planning, not the degree of cunning shown by a defendant in executing his or her criminal scheme, that bears on the more-than-minimal-planning enhancement.

Coriaty concedes that on three separate occasions after he had moved money from the FFP account, he tendered checks to Durr. The government explains that these checks were payable to Durr from a fictional entity called "Romano Capital." Coriaty also failed to respond to requests from Durr and her associates for statements for the Advest account. The misleading checks and false statements form a "pattern of 'false statements'" that, standing alone, merits imposition of a § 2F1.1(b)(2) enhancement, independent of the multiple wire frauds. *United States v. Walsh*, 119 F.3d 115, 121 (2d Cir.1997).

## VI. The Downward Departure for Family Circumstances

■ Coriaty argues that "it was an abuse of discretion not to depart downward" based on evidence that his daughter would suffer "life-long emotional trauma" because of his imprisonment. Appellant's Br. at 26, 28. Before sentencing, Coriaty sent the district court a letter requesting a downward departure based on family circumstances. The government responded that such a departure was unwarranted. At the sentencing hearing, the district court concluded that there was "no reason to depart from the sentencing called for by the application of the guidelines."

Coriaty does not argue that Judge Tsoucalas failed to understand his authority to depart downward or that he misapplied the law. In fact, Judge Tsoucalas had before him the government's brief explain-

ing when departures were appropriate. A "decision [thus] not to depart from the Guidelines is not . . . appealable." *United States v. Brown*, 98 F.3d 690, 692 (2d Cir.1996). Absent facts suggesting that the district court did not understand its authority to depart, we will not review the district court's decision. *See id.*

## VII. Prejudicial Summation

■■ Finally, Coriaty contends that the government violated his due process rights through prejudicial comments during summation. The comments occurred in the context of the government's description of two defense witnesses, an expert, Dr. Loretta Fabricant, and Coriaty himself. Dr. Fabricant's testimony, the prosecutor argued, "was built on a foundation of sand," insofar as "[s]he was making opinions and conclusions based on what the defendant told her . . . . [T]here is an expression, garbage in, garbage out. . . . What was coming in was garbage, what was going out . . . was garbage too, and her entire testimony was built on the lies of the defendant." Appellee's Br. at 50 (quoting Tr. at 1295–96). The government further stated that "her job was at best just a little sloppy and at worst really a house of cards." *Id.* at 50 (quoting Tr. at 1299). Turning to Coriaty's testimony, the prosecutor noted that "his story makes no sense on so many levels," and was "a sideshow." *Id.* at 52 (quoting Tr. at 1299–30).

■■ Before a conviction will be reversed, a prosecutor's comments upon summation must "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The defendant must point to "egregious misconduct." *Id.* at 647;, 94 S.Ct. 1868 *see also United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (noting that prosecutorial misconduct must cause the defendant "substantial prejudice" to warrant reversal); *accord United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir.1993), *cert. denied*, 512 U.S. 1224, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994). "[W]here, as here, the defendant did not object to the remarks at trial, reversal is warranted only where the remarks amounted to a 'flagrant abuse.'" *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir.1998) (quoting *United States v. Araujo*, 79 F.3d 7, 9 (2d Cir.1996)), *cert. denied*, 525 U.S. 1083, 119 S.Ct. 829, 142 L.Ed.2d 686 (1999).

■■ The prosecutor's remarks do not come within hailing distance of prejudice. They all concerned witness veracity. The phrase "garbage in, garbage out,"[7] for example, was used to suggest that the expert's conclusions could not be trusted because they were based on information furnished by Coriaty. On many occasions, we have upheld convictions after a summation including negative characterizations of witness credibility. "Use of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1987); *accord Shareef*, 190 F.3d at 79 ("[I]t is not ordinarily improper for the prosecution to make temperate use of forms of the word 'lie' to . . . characterize disputed testimony

**7.** "Often abbreviated as GIGO, ['garbage in, garbage out'] is a famous computer axiom meaning that if invalid data is entered into a system, the resulting output will also be invalid. Although originally applied to computer software, the axiom holds true for all systems, including, for example, decision-making systems." Webopedia, *Garbage In, Garbage Out*, *at* http://www.webopedia.com/TERM/G/garbage_in_garbage_out.html (last modified: December 3, 2001).

where credibility was clearly an issue, particularly where the prosecutor tied to the pertinent evidence of record each instance in which the defendant supposedly lied.") (internal quotation marks and punctuation omitted). We have upheld convictions after summations in which a witness was "[s]everal times ... called ... a 'liar.'" *Peterson,* 808 F.2d at 976–77. And "argu[ing] the accuracy of the underlying, albeit contested, facts" is not prejudicial. *United States v. Zichettello,* 208 F.3d 72, 103 (2d Cir.2000), *cert. denied,* 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001).

The government's remarks thus provide no basis for disturbing Coriaty's conviction.

## CONCLUSION

For the foregoing reasons, the appeal is dismissed with respect to the district court's failure to depart because of Coriaty's family circumstances; the remainder of the judgment of the district court is affirmed.